UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BRADLEY CRAWFORD, DEREK GRIESEL, HANK VANDERHULST, and LEROY MAULT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FCA US LLC, f/k/a Chrysler Group LLC, a Delaware corporation,<br><br>Defendant. | Case No. 20-12341<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................1

II.   PARTIES ..........................................................................8

    A.    The Plaintiffs ...........................................................8

        1.    Plaintiff Bradley Crawford .............................8

        2.    Plaintiff Derek Griesel ...................................13

        3.    Plaintiff Hank Vanderhulst ............................19

        4.    Plaintiff Leroy Mault ....................................23

    B.    The Defendant ........................................................27

    C.    Plaintiffs' Individual and Class-Wide Bases for Suit ........................28

III.  VENUE AND JURISDICTION ........................................30

IV.  FACTUAL ALLEGATIONS ...........................................31

    A.    The Class Vehicles contain EGR cooler-equipped EcoDiesel engines. ...............................................31

    B.    FCA profits from the popularity of EcoDiesel vehicles. ...................32

    C.    The fragile EGR cooler design ...........................33

    D.    FCA knew, via repair records, publically available complaints, blogs monitored by FCA, and via industry sources, that the EGR cooler was susceptible to cracking. ................35

    E.    Investigation and recall ......................................45

    F.    Subsequent failure to act ...................................47

    G.    The EGR cooler defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles per se defective. ...........................................................52

H.  FCA concealed, both affirmatively and via omission, the defective nature of the EGR cooler. .......................................54

I.  FCA routinely denies responsibility for fixes, both by denying warranty claims, and by denying that truck fires are due to the EGR cooler defect. ......................................56

J.  FCA also misrepresented that loaner vehicles would be provided to impacted owners. .............................................59

K.  FCA continued to sell vehicles with the subject coolers after the announcement of the recall. .................................60

L.  FCA has a long pattern of turning its back on owners before and after recalls. .......................................................61

    1.  2014 NHTSA investigation .........................................62

    2.  2014 lack of availability of basic parts. ....................63

    3.  Frustrating delays implementing a TSB relating to a cooler hose fix. ....................................................63

    4.  Parts unavailable for 2015 recall fix on Ram 1500 .................64

M.  Allegations Establishing Agency Relationship Between Manufacturer FCA And FCA Dealerships ............................65

V.  TOLLING OF THE STATUTE OF LIMITATIONS ....................................68

VI.  CLASS ACTION ALLEGATIONS ................................................70

VII.  CAUSES OF ACTION .......................................................75

A.  Claims brought on behalf of the Nationwide Class ............................75

COUNT I  VIOLATIONS OF 15 U.S.C. § 2301, ET SEQ.  THE MAGNUSON-MOSS WARRANTY ACT ................................................75

B.  Claims brought on behalf of the California Subclass ........................78

COUNT I  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, ET SEQ.) ............................78

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR
          COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200,
          ET SEQ.)................................................................................85

COUNT III  FRAUD BY CONCEALMENT ............................................87

COUNT IV  REACH OF EXPRESS WARRANTY ................................91

COUNT V  VIOLATION OF SONG-BEVERLY CONSUMER
          WARRANTY ACT FOR BREACH OF IMPLIED
          WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE
          §§ 1791.1 & 1792).................................................................92

COUNT VI  BREACH OF CONTRACT  (BASED ON
          CALIFORNIA LAW).............................................................95

COUNT VII  UNJUST ENRICHMENT ..................................................96

    C.    Claims brought on behalf of the Hawaii Subclass .............98

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF
          HAWAII LAW (HAW. REV. STAT. ANN. § 480, ET SEQ.) ...................98

COUNT II  BREACH OF EXPRESS WARRANTY ...........................102

COUNT III  BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY (HAW. REV. STAT. ANN. § 490:2-
          314) ......................................................................................103

COUNT IV  FRAUDULENT CONCEALMENT  (BASED ON
          HAWAII LAW)....................................................................104

COUNT V  BREACH OF CONTRACT  (BASED ON HAWAII
          LAW).....................................................................................109

    D.    Claims brought on behalf of the Idaho Subclass...............111

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER
          PROTECTION ACT (IDAHO CIV. CODE § 48-601 ET SEQ.)..............111

COUNT II  FRAUDULENT CONCEALMENT  (BASED ON
          IDAHO LAW)......................................................................116

COUNT III  BREACH OF EXPRESS WARRANTY .........................121

010939-11/1336705 V1

COUNT IV  BREACH OF CONTRACT  (BASED ON IDAHO
LAW)................................................................................................122

COUNT V  UNJUST ENRICHMENT................................................................124

E.      Claims brought on behalf of the Kansas Subclass ...........................125

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER
PROTECTION ACT (KAN. STAT. ANN. § 50-623 ET SEQ.) ...............125

COUNT II  BREACH OF EXPRESS WARRANTY ...........................................131

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (KAN. STAT. ANN. § 84-2-314).......................132

COUNT IV  FRAUDULENT CONCEALMENT  (BASED ON
KANSAS LAW)................................................................................133

COUNT V  BREACH OF CONTRACT  (BASED ON KANSAS
LAW)................................................................................................137

PRAYER FOR RELIEF ....................................................................................139

DEMAND FOR JURY TRIAL ...........................................................................141

BRADLEY CRAWFORD, DEREK GRIESEL, HANK VANDERHULST, and LEROY MAULT, individually and on behalf of all others similarly situated (collectively "Plaintiffs"), file this Class Action Complaint against Defendant FCA US LLC, f/k/a Chrysler Group LLC ("FCA"). This lawsuit is based upon the investigation of counsel and upon information and belief as noted. In support thereof, Plaintiffs state as follows:

## I.    INTRODUCTION

1.      Since at least June 2013, Defendant FCA designed, manufactured, distributed, and sold hundreds of thousands of Dodge Ram 1500 and 1500 Classic vehicles equipped with 3.0L Eco Diesel engines (the "Class Vehicles") which contain grossly defective EGR coolers.[1] These EGR coolers are susceptible to thermal fatigue, leading the coolers to crack over time and leak coolant, which can cause combustion within the intake manifold and lead to a vehicle fire.[2] Many

---

[1] "The suspect period began on June 12, 2013, when RAM 1500 3.0L Eco Diesel production with the suspect EGR coolers started, and was concluded on October 23, 2019, when production of Ram 1500/1500 Classic vehicles with 3.0L Eco Diesel engines built with the suspect EGR coolers ended." Ex. 1, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-3239.PDF.

[2] Some 2014–2019 MY Ram 1500/1500 Classic ("Ram 1500") vehicles equipped with the 3.0L Eco Diesel engine, may have been built with Exhaust Gas Recirculation ("EGR") coolers that are susceptible to thermal fatigue. "Thermal fatigue may cause the cooler to crack internally over time. An EGR cooler with an internal crack will introduce pre-heated, vaporized coolant to the EGR system while the engine is running. In certain circumstances, this mixture interacts with other hydrocarbons and air in the system, potentially resulting in combustion within the intake manifold, which may lead to a vehicle fire." *Id.*; Ex. 2, Chrysler

owners of the Class Vehicles have already experienced a sudden loss of power and catastrophic fires due to this condition, including two of the Plaintiffs here.

2.      In June 2019, FCA announced that its 2020 Ram 1500 would be released with an all new third-generation engine, which includes significant changes to the EGR system, including a change to a dual loop (low and high pressure system).[3]

3.      In October 2019, FCA announced a voluntary safety recall of vehicles equipped with these EGR coolers. The recall impacted the 2014–2019 model year Ram 1500 and 1500 Classic trucks equipped with the 3.0L EcoDiesel engine.[4] FCA admitted that the defect places vehicle owners and occupants, as well as those outside the vehicle, at risk of injury[5] and is present in 100% of the affected vehicles.[6]

4.      While ordinarily an automobile recall is a path towards relief for affected owners and lessees, in this case FCA has, under the cloak of this voluntary recall, made a number of misrepresentations that have shifted the significant and

---

(FCA US LLC) Part 573 Safety Recall Report" dated October 31, 2019, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-3602.PDF.

[3] Ex. 37, https://dieselnet.com/news/2019/06fca2.php.

[4] *See* Ex. 1, NHTSA Part 573 Safety Recall Report, 19V-757.

[5] *Id*.

[6] *Id.*

serious risk of inoperable vehicles and injury onto its customers, compounded the danger to customers, and left them with no meaningful recourse aside from parking their trucks permanently.

5.      First, when the recall was announced 10 months ago, FCA told affected consumers that "the remedy for this condition is not currently available" but that the company was "making every effort to finalize the remedy as quickly as possible . . . ."[7] Customers were told they would be notified "when the remedy is available. Once you receive your follow-up notice, simply contact your . . . dealer right away to schedule a service appointment."[8] This created the expectation that a fix would arrive soon, that it would be available for all affected vehicles regardless of whether the defect had already resulted in a crack or not, and that FCA would contact customers when a remedy was available.[9]

6.      Second, affected customers were advised in the interim to "monitor their coolant levels" and contact their dealers if the levels were "consistently low."[10] This created the impression that consumer monitoring would be adequate to mitigate the danger, and that if a customer made a dealership aware of low

---

[7] Ex. 3, Issued Interim Notification Letter, https://static.nhtsa.gov/odi/rcl/2019/RIONL-19V757-4940.pdf.

[8] *Id.*

[9] *Id.*

[10] *Id.*

coolant levels, then contacting the dealership would enable the customer to obtain some remedy.

7.      Third, FCA later sent notices to certain owners and lessees letting them know a fix was available for their specific vehicle VIN. The notice indicated "it is extremely important to take steps now to repair your vehicle to ensure the safety of your passengers."[11] This notice, in addition to suggesting that the earlier message that monitoring coolant levels would be sufficient was not correct, misrepresented to owners that a fix was available. However, despite these specific notifications to affected owners and lessees and FCA's announcement that a fix was available for the 2014–2015[12] and 2016[13] model years, it appears that affected owners and lessees are still routinely being denied a fix due to part unavailability.

8.      Fourth, FCA indicated that the EGR cooler is defective in 100% of vehicles as the defect lies in the cooler's propensity to crack.[14] FCA announced it

---

[11] Ex. 4, Letter received by owner of 2016 Ram 1500. Note that this letter does not appear on NHTSA's website. NHTSA's website has a letter with this language, but it only lists the 2014–2015 models.

[12] Ex. 5, April 2020 FCA Dealer Service instructions, https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V757-1761.pdf#:~:text=Safety%20Recall%20VB1%20%E2%80%93Diesel%20EGR%20CoolerPage%202%20The,cause%20the%20cooler%20to%20crack%20internally%20over%20time.

[13] Ex. 6, https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V757-8953.pdf.

[14] "Estimated percentage with defect: 100%." *See,* Ex. 2, Chrysler (FCA US LLC) Part 573 Safety Recall Report" dated October 31, 2019.

- 4 -

would conduct a recall "on all affected vehicles to replace the EGR cooler with a new EGR cooler (part number 68483334AA) that is not susceptible to thermal fatigue."[15] FCA indicated the repair must also be made on all unsold vehicles before retail delivery.[16] Yet dealerships were advised that "part supply is extremely limited" and that, as a result, the EGR cooler should only be replaced "if the part has failed."[17]

9.      FCA seemingly admits that it is making repair determinations based on part scarcity in this wholly contradictory instruction to dealerships: "An EGR Cooler should only be replaced if the part has failed. *If the vehicle does not need any repairs* and the customer is still concerned for their safety, please provide the customer with a loaner vehicle *until such time that the remedy for the recall is available*."[18]

10.     No Plaintiff or reasonable consumer would have purchased or leased these vehicles and/or paid the price they paid for these vehicles had they known about the EGR cooler defect. FCA hid the defect, then led customers to believe a

---

[15] Ex. 7, https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-2821.PDF.

[16] *See* Ex. 5.

[17] Ex. 8, Manufacturer Notices (to Dealers, etc.) - December 2019 SAFETY RECALL VB1: 2014–2019 DS 3.0L EGR Cooler Customer Handling, FCA VB1 "Dealer Communication Final," https://static.nhtsa.gov/odi/rcl/2019/RCMN-19V757-0602.pdf.

[18] *Id*. (emphasis added).

fix was imminent,[19] then told them a fix was available[20] but is putting affected owners and lessees back on the road without a fix.

11.     FCA has completely failed its customers by continuing its pattern of putting profits over safety. The company's botched EGR cooler recall comes just five years after FCA received a record civil penalty from the federal government related to the company's failure over several years to provide Early Warning Report data to NHTSA as required under the TREAD Act.[21] That penalty was included in an amendment to a 2015 consent order NHTSA issued regarding FCA's administration of two dozen safety recalls, with total penalties from that investigation totaling $175 million.[22]

12.     At the time, FCA acknowledged its failures, declared its "resolve to improve our handling of recalls and re-establish the trust our consumers place in us," and took steps to research "obstacles that discourage consumers from

---

[19] Ex. 3, FCA Interim owner notification letter, https: //static. nhtsa. gov /odi/rcl/2019/RIONL-19V757-4940.pdf ("We are making every effort to finalize the remedy as quickly as possible . . . .").

[20] *See* Exs. 13–15, FCA VB1-1st notices to Plaintiffs Mault and Vanderhulst.

[21] Ex. 9, NHTSA press release, *U.S. DOT Fines Fiat Chrysler $70 million for Failure to Provide Early Warning Report Data to NHTSA* (Dec. 10, 2015), https://one.nhtsa.gov/About-NHTSA/Press-Releases/nhtsa_fca_penalty_12102015.

[22] *Id.*

responding to recall notices"—an effort that is particularly ironic in light of current circumstances surrounding the EGR recall.[23]

13.     The ink is also barely dry on the settlement and consent decree resulting from FCA's emissions scandal, which also impacted the Dodge Ram 1500 EcoDiesel truck.[24]

14.     Customers are entitled to FCA's honesty—if there isn't a remedy readily available, customers should be told this and be given a meaningful choice regarding what to do with their truck. Customers of all the affected models who as of this date have not been provided with a fix, including those customers who have already experienced a catastrophic event as a result of FCA's deception, are also entitled to reimbursement for the many millions of dollars FCA fraudulently obtained from them, and to compensation for their actual losses.

15.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles as defined herein. Plaintiffs and the Class seek monetary damages, business reforms, and injunctive and other equitable relief for Defendant's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as alleged in this

---

[23] Ex. 10, FCA US LLC Consent Order Response (July 26, 2015), https://media. fcanorthamerica.com/newsrelease.do?id=16862&mid=431.

[24] Ex. 11, https://www.epa.gov/sites/production/files/2019-02/documents/fca-cd.pdf.

complaint. Plaintiffs and Class members are also entitled to a significant award of punitive or exemplary damages given that Defendant deliberately deceived Plaintiffs and Class members, disregarded their rights to make free and informed consumer choices, damaged them economically, and put them at real risk of physical harm or death.

## II.   PARTIES

**A.   The Plaintiffs**

### 1.   Plaintiff Bradley Crawford

16.   Plaintiff Bradley Crawford ( "Plaintiff Crawford") is and was throughout the events pleaded here a citizen of the State of Hawaii, and domiciled in Volcano, Hawaii. On or about March 28, 2016, Plaintiff Crawford purchased a new 2016 Ram 1500 EcoDiesel (for the purpose of this subsection, the "Class Vehicle" or "Truck") for approximately $47,621.21 from the Kamaaina Motors dealership in Hilo, Hawaii. Plaintiff Crawford had the Class Vehicle registered in his home state of Hawaii, where it is still registered today. At the time of purchase, the Class Vehicle had approximately 21 miles on it and had a 120,000 mile factory warranty.

17.   Unknown to Plaintiff Crawford at the time the Class Vehicle was purchased, it was equipped with an EGR cooler that was defective and did not function as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the

Class Vehicle with the EGR cooler defect caused Plaintiff Crawford out-of-pocket loss, diminished value of the Class Vehicle, and near loss of life.

18.     Plaintiff Crawford used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff Crawford reviewed the Monroney Label FCA placed on the window. The window sticker advertised the Class Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff Crawford relied on the advertisements contained within the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed any defects.

19.     In approximately October or November 2019, Plaintiff Crawford received a recall notice from FCA indicating there was a recall on his 2016 Ram 1500 EcoDiesel, due to a faulty EGR cooler. That recall notice indicated that there was no remedy or fix for the defect at that time. The notice suggested that owners of Class Vehicles should monitor their vehicle coolant level and contact the dealership if it was low.

20.     In May 2020, Plaintiff Crawford received an email from Kamaaina Motors notifying him that a service appointment had been scheduled for him for May 22, 2020. He was told that three recall fixes needed to be done on his truck,

- 9 -

including the EGR cooler recall fix. Plaintiff Crawford advised the dealership to do all three recalls, as well as an oil change and a safety check.

21.    On May 26, 2020, Plaintiff Crawford received a telephone call from Kamaaina Motors stating that his truck was ready for pickup, and that all service had been completed. Plaintiff Crawford paid $367.44 for the service, and left under the impression the EGR recall fix had been done.

22.    On July 17, 2020, Plaintiff Crawford and his family were traveling on a two-way road in Hawaii when, without any check engine light or warning, the truck experienced a sudden, noticeable loss of power. Plaintiff Crawford pulled over and parked, concerned the truck would not make it to his destination two hours away. He then made a U-turn to head immediately to Kamaaina Motors to investigate the issue. Two minutes later, he was approaching a curve in the road, traveling at approximately 50 mph, when he tried to brake but found the brakes soft and unresponsive. He applied full pressure to the brake pedal, while racing to come up with a backup plan if his brakes didn't work. The truck eventually came to a stop. Plaintiff Crawford placed his truck in park and saw light gray smoke coming from the hood. His wife got out of the truck and quickly pulled their daughter out of the back seat. Plaintiff Crawford then got his dog out from the back seat as the truck became fully engulfed in flames.

23.     An off-duty police officer and a nearby HELCO employee nearby witnessed the fire. The HELCO employee ran over with a fire extinguisher while the officer called for backup to close the road. Plaintiff Crawford called the fire department. The road was closed and the fire department was on the scene within minutes. Plaintiff Crawford took photographs at the scene and called his insurance company. He also called Kamaaina Motors' service department to notify them. When he was connected to a service manager, and explained what happened, he was referred to the Fiat Chrysler Automobile Recall phone number for the EGR cooler recall.

24.     The vehicle was inspected and FCA concluded that "the information at hand would not permit us to associate the fire with a manufacturing or assembly error."[25] FCA told Plaintiff they "decline any assistance associated with this matter" but "sincerely regret the unfortunate fire."[26]

25.     At the time of the fire, Plaintiff Crawford's Class Vehicle was still under FCA's 120,000-mile manufacturer's warranty. Plaintiff Crawford's 2016 Ram had approximately 116,000 miles on it at the time of the fire. Plaintiff lost use

---

[25] Ex. 12, August 5, 2020 email from Chryslersi@fcagroup.com to Plaintiff Crawford.

[26] *Id.*

of his sole vehicle as a result of this catastrophic failure due to the defective EGR cooler.

26.     Prior to purchasing the Class Vehicle, Plaintiff Crawford had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, as well as occasionally to pull a food trailer, Plaintiff Crawford saw and recalled FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the Dodge Ram EcoDiesel—the Class Vehicle Plaintiff Crawford would subsequently purchase—had enhanced durability compared to other comparable vehicles on the American market. On the date Plaintiff Crawford purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff Crawford reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was durable and reliable and free from defect. Plaintiff Crawford, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff Crawford contained any disclosure that the Truck had a defective EGR cooler which could cause an engine fire. Had FCA made this disclosure, Plaintiff Crawford would have received this disclosure through his research, and he would not have purchased the Truck or would have paid less for it. There is a substantial

- 12 -

difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff Crawford; thus, Plaintiff Crawford did not receive the benefit of the bargain, but received less than what was bargained for.

### 2.    Plaintiff Derek Griesel

27.     Plaintiff Derek Griesel ( "Plaintiff Griesel") is and was throughout the events pleaded here a citizen of the State of Kansas, and domiciled in Arkansas City, Kansas. On or about April 25, 2018, Plaintiff Griesel purchased a used 2016 Dodge Ram 1500 EcoDiesel Laramie Longhorn edition (for the purpose of this subsection, the "Class Vehicle" or "Truck") for approximately $37,000, plus trade-in of Plaintiff Griesel's prior vehicle, from the Jackie Cooper Nissan dealership in Tulsa, Oklahoma. Plaintiff Griesel had the Class Vehicle registered in his home state of Kansas. At the time of purchase, the Class Vehicle had approximately 107,754 miles on it.

28.     Unknown to Plaintiff Griesel at the time the Class Vehicle was purchased, it was equipped with an EGR cooler that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Class Vehicle with the EGR cooler defect caused Plaintiff Griesel out-of-pocket loss, diminished value of the Class Vehicle, and near loss of life.

- 13 -

29.     Plaintiff Griesel used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff Griesel reviewed the Monroney Label FCA placed on the window. The window sticker advertised the Class Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff Griesel relied on the advertisements contained within the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed any defects.

30.     On approximately May 17, 2019 Plaintiff Griesel's Truck was brought to the Bob Hurley Dodge Chrysler Jeep Ram dealership in Ponca City, Oklahoma. At that visit the dealership did some active recall fixes. Plaintiff Griesel picked up his Truck on June 12, 2019.

31.     On approximately August 12, 2019, Plaintiff Griesel again brought the truck into the Bob Hurley dealership. He brought the Truck in for the specific purpose of having the EGR system checked, as the Truck was losing coolant. He also had acceleration concerns. He picked up the Truck on September 13, 2019. The dealership service department did not check the EGR system at that visit. They simply added coolant, and told Plaintiff Griesel to watch the coolant level.

32.     On September 16, 2019, just three days after Plaintiff Griesel picked up his Truck from the Bob Hurley dealership, he was driving alone on a two-lane

road to work in Oklahoma, traveling at approximately 55 miles per hour, when his check engine light illuminated.

33.     Shortly thereafter, the service throttle control light illuminated. Plaintiff Griesel lost the ability to accelerate. Then, shortly thereafter, the low oil pressure light illuminated and the Truck lost all power. Plaintiff Griesel coasted the Truck into his work location, a group home for individuals with disabilities, to retrieve some necessary work paperwork. He returned outside and was astonished to see smoke coming out from under his Truck's hood. He opened the hood and saw a fire on the left side of the engine bay in the intake/EGR area.

34.     Plaintiff Griesel immediately became concerned for the safety of the group home residents, due to the proximity of the Truck to the home. He quickly got into the Truck to put it in neutral via the disengagement lever to roll it away from the home. He had barely gotten back out when the engine bay became fully engulfed in flames.

35.     The fire department was called. As Plaintiff Griesel was waiting for them to arrive, the windshield exploded out of the vehicle, sending shards of glass everywhere. The sunroof, side windows, rear side windows, and rear windshield then shattered. The entire Truck was on fire.





010939-11/1336705 V1



36.     Plaintiff Griesel's vehicle had about 152,034 miles on it at the time of the fire. The fire resulted in a total loss. His insurance company quoted him $53,184.89 to repair the vehicle to its pre-fire condition.

37.     The Plaintiff Griesel contacted FCA. FCA arranged for a truck inspection after the fire. The inspection report stated there was no vehicle manufacturing defect. FCA paid for vehicle towing costs, but denied any financial assistance.

38.     Approximately one or two months after the fire, Plaintiff Griesel received a recall notice from FCA indicating there was a recall on his Truck due to a faulty EGR cooler.

010939-11/1336705 V1

39.     Plaintiff Griesel lost the use of his Truck, his sole means of transportation. The fire also damaged about $1,000.00 worth of Plaintiff Griesel's and the group home residents' property. The Truck fire was so severe that there are still shards of glass melted into the pavement and a large blackened spot in the driveway, a reminder Plaintiff Griesel sees every day. The group home had to pay to fix the siding on the group home that had melted due to its proximity to the fire.

40.     Prior to purchasing the Class Vehicle, Plaintiff Griesel had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff Griesel saw and recalled FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the Dodge Ram EcoDiesel— the Class Vehicle Plaintiff Griesel would subsequently purchase—had enhanced durability compared to other comparable vehicles on the American market. On the date Plaintiff Griesel purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff Griesel reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was durable and reliable and free from defect. Plaintiff Griesel, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff Griesel contained any disclosure that the Truck had a defective EGR cooler which could

- 18 -

cause an engine fire. Had FCA made this disclosure, Plaintiff Griesel would have received this disclosure through his research and he would not have purchased the Truck or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff Griesel; thus, Plaintiff Griesel did not receive the benefit of the bargain, but received less than what was bargained for.

### 3.  Plaintiff Hank Vanderhulst

41.  Plaintiff Hank Vanderhulst ( "Plaintiff Vanderhulst") is a citizen of the State of California, and domiciled in San Jose, California. On or about August 19, 2014, Plaintiff Vanderhulst purchased a new 2014 Ram 1500 EcoDiesel truck (for the purpose of this subsection, the "Class Vehicle" or "Truck") for approximately $49,145.00 from the Stevens Creek Dodge dealership in San Jose, California. Plaintiff Vanderhulst had the Class Vehicle registered in his home state of California, where it is currently registered. At the time of purchase, the Class Vehicle was new and Plaintiff Vanderhulst purchased a 7-year/100,000-mile warranty for $700.00.

42.  Unknown to Plaintiff Vanderhulst at the time the Class Vehicle was purchased, it was equipped with an EGR cooler that was defective and did not function as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the

Class Vehicle with the EGR cooler defect caused Plaintiff Vanderhulst out-of-pocket loss and diminished value of the Class Vehicle.

43.     Plaintiff Vanderhulst used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff Vanderhulst reviewed the Monroney Label FCA placed on the window. The window sticker advertised the Class Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff Vanderhulst relied on the advertisements contained within the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed any defects.

44.     In approximately February or March 2020, Plaintiff Vanderhulst received a recall notice from FCA addressed to him, indicating there was a recall on his 2014 Ram 1500 EcoDiesel due to a faulty EGR cooler. That recall notice indicated that there was a fix available for his specific vehicle and provided his VIN. The notice indicated it is "extremely important to take steps now to repair your vehicle to ensure the safety of you and your passengers."[27]

---

[27] Ex. 13, FCA Recall notice to Plaintiff Hank Vanderhulst, 0042836/#96037/ VB1-1[ST].

- 20 -

45.     Following his receipt of this notice, Plaintiff Vanderhulst visited the Stevens Creek Chrysler Jeep Dodge dealership to obtain the recall fix for the EGR cooler defect.

46.     At that visit, which occurred in approximately March or April, Plaintiff Vanderhulst was told that the EGR cooler recall part was not available. Plaintiff Vanderhulst was told by the dealership that FCA only provided a few parts per week to the dealership for the fix. The dealership told him that they would put him on a wait list they were maintaining to contact all owners who were waiting for this part, and that he was number eight on the list.

47.     Plaintiff Vanderhulst waited but was not contacted by the dealership.

48.     In approximately June 2020, Plaintiff Vanderhulst visited the Stevens Creek Chrysler Jeep Dodge dealership again. During this visit he was told by the service technician that he had moved up to fifth on the list.

49.     Plaintiff Vanderhulst waited but was not contacted by the dealership.

50.     Plaintiff Vanderhulst returned to the dealership again in July, and inquired about the recall fix he was waiting for. He was told he was still fifth on the wait list.

51.     Plaintiff Vanderhulst waited but was not contacted by the dealership.

52.     Plaintiff Vanderhulst returned to the dealership again on July 30, 2020 for an oil change and tire rotation. At this visit he again inquired about the recall

fix he was waiting for and was told that he was still fifth on the wait list. He believes his coolant was topped off on his visit.

53.     Plaintiff Vanderhulst has since observed that his coolant level has dropped again.

54.     Plaintiff Vanderhulst feels unsafe driving his truck due to the fire hazard and the fact that a repair is needed, according to FCA, to make his car safe, but that, according to the FCA dealership, this repair is not available.

55.     Prior to purchasing the Class Vehicle, Plaintiff Vanderhulst had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff Vanderhulst saw and recalled FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the Dodge Ram EcoDiesel—the Class Vehicle Plaintiff Vanderhulst would subsequently purchase—had enhanced durability compared to other comparable vehicles on the American market. On the date Plaintiff Vanderhulst purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff Vanderhulst reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was durable and reliable and free from defect. Plaintiff Vanderhulst, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or

- 22 -

representations received by Plaintiff Vanderhulst contained any disclosure that the

Truck had a defective EGR cooler which could cause an engine fire. Had FCA

made this disclosure, Plaintiff Vanderhulst would have received this disclosure

through his research, and he would not have purchased the Truck or would have

paid less for it. There is a substantial difference in the market value of the vehicle

promised by Defendant and the market value of the vehicle received by Plaintiff

Vanderhulst; thus, Plaintiff Vanderhulst did not receive the benefit of the bargain,

but received less than what was bargained for.

### 4.    Plaintiff Leroy Mault

56.    Plaintiff Leroy Mault ( "Plaintiff Mault") is a citizen of the State of

Idaho, and domiciled in Buhl, Idaho. At the time he purchased his truck he resided

in Draper, Utah. On or about October 14, 2016, Plaintiff Mault purchased a new

2016 Ram 1500 EcoDiesel Big Horn edition truck (for the purpose of this

subsection, the "Class Vehicle" or "Truck") for approximately $47,000 from the

Ken Garth Chrysler dealership in West Valley City, Utah. Plaintiff Mault had the

Class Vehicle registered in his home state of Utah, and it is currently registered in

Idaho. At the time of purchase, the Class Vehicle was new and had a three-

year/36,000-mile warranty.

57.    Unknown to Plaintiff Mault at the time the Class Vehicle was

purchased, it was equipped with an EGR cooler that was defective and did not

function as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Class Vehicle with the EGR cooler defect caused Plaintiff Mault out-of-pocket loss and diminished value of the Class Vehicle.

58.     Plaintiff Mault used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff Mault reviewed the Monroney Label FCA placed on the window. The window sticker advertised the Class Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff Mault relied on the advertisements contained within the window sticker when deciding to purchase the Class Vehicle. The Monroney sticker did not disclose that the Class Vehicle possessed any defects.

59.     In approximately October or November 2019, Plaintiff Mault received a recall notice from FCA indicating there was a recall on his 2016 Ram 1500 EcoDiesel due to a faulty EGR cooler. That recall notice indicated there was no remedy or fix for the faulty EGR cooler at that time. The notice suggested that owners of Class Vehicles should monitor the vehicle coolant level and contact the dealership if it was consistently low.[28]

---

[28] Ex. 14, Undated Recall Notice to Plaintiff Mault, #0073497/#94336/VB1-1st.

60.     In approximately March or April 2020, Plaintiff Mault contacted a dealership near his home, Larry H. Miller Chrysler Jeep Dodge in Sandy, Utah, to see if a remedy was available for the EGR cooler defect.

61.     At that visit Plaintiff Mault was told that the EGR cooler recall part was not available. The dealership told him that they would put him on the list they were maintaining to contact all owners who were waiting for this part. This dealership still has not called Plaintiff Mault.

62.     Shortly thereafter, Plaintiff Mault took his car to a local Jiffy Lube for service. At that visit the mechanic noted his car was losing coolant and added coolant.

63.     Plaintiff Mault moved to Idaho on approximately May 1, 2020.

64.     In approximately May or June 2020, Plaintiff Mault received a recall letter from FCA addressed to his Idaho address indicating a fix was available for his 2016 truck and providing his vehicle VIN. The recall letter to Plaintiff Mault indicated "it is extremely important to take steps now to repair your vehicle to ensure the safety of you and your passengers."[29] Plaintiff Mault then contacted his local dealership, Lithia Chrysler Jeep Dodge in Twin Falls, Idaho to get the EGR coolant fix.

---

[29] Ex. 15, Safety Recall Notice sent to Plaintiff Mault, #0020312/#96073/VB1-1st.

65.    At this visit, which occurred in approximately June 2020, the dealership told him the part was not available. The dealership told Plaintiff Mault they were not maintaining a customer waitlist for the part. Plaintiff Mault was told to just keep calling the dealership once a month to see if the part is available.

66.    Plaintiff Mault no longer feels comfortable driving his Truck due to the fact that a repair is needed, according to FCA, to make his car safe, but that, according to the FCA dealership, this repair is not available. Plaintiff Mault keeps his Truck parked and does not drive it due to his concerns for his safety.

67.    Prior to purchasing the Class Vehicle, Plaintiff Mault had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff Mault saw and recalled FCA's television commercials, radio advertisements, and printed brochures and advertisements wherein FCA claimed the Dodge Ram EcoDiesel— the Class Vehicle Plaintiff Mault would subsequently purchase—had enhanced durability compared to other comparable vehicles on the American market. On the date Plaintiff Mault purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff Mault reasonably relied—to his detriment—on the representations by FCA that the Class Vehicle was durable and reliable and free from defect. Plaintiff Mault, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none

- 26 -

of the advertisements reviewed or representations received by Plaintiff Mault contained any disclosure that the Truck had a defective EGR cooler which could cause an engine fire. Had FCA made this disclosure, Plaintiff Mault would have received this disclosure through his research, and he would not have purchased the Truck or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiff Mault; thus, Plaintiff Mault did not receive the benefit of the bargain, but received less than what was bargained for.

**B.     The Defendant**

68.     Defendant FCA US LLC ("FCA") is a Delaware limited liability company. Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time Chrysler Group LLC became a wholly-owned indirect subsidiary of Fiat and was renamed FCA US LLC. FCA's principal place of business and headquarters is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

69.     FCA, through its various entities, designs, manufactures, markets, distributes, sells, and leases FCA automobiles in this District and multiple other locations in the United States under the Dodge, Jeep, Chrysler, and Fiat brand names. FCA, and/or its agents and subsidiaries, designed, manufactured, distributed, offered for sale, sold, and installed the engine systems in the Class

- 27 -

Vehicles. FCA also developed and disseminated the materially misrepresentative owners' manuals, warranty booklets, product brochures, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all 50 states. FCA is engaged in interstate commerce, marketing, selling, and leasing vehicles through its network in every state of the United States.

70.     FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its 2,000+ authorized dealerships nationwide.

## C.     Plaintiffs' Individual and Class-Wide Bases for Suit

71.     Although Plaintiffs were considering other vehicles, Plaintiffs decided to purchase their subject Class Vehicles because they reasonably relied upon FCA's claims touting the Class Vehicles as free of defect and as durable and reliable—by way of media marketing campaigns and other forms of advertisement described further herein. These misrepresentations and omissions, in combination with the representation and understanding that the vehicle would retain all of its promised durability and performance throughout its useful life, and the

- 28 -

representation and understanding that the vehicle was free of defects and fit for its intended use, induced Plaintiffs to purchase the Class Vehicles.

72.    Unbeknownst to the named Plaintiffs and Class members, when they purchased their Class Vehicles, the FCA-made Class Vehicles contained an EGR cooler that is inherently defective—the critical, material truth of which was never disclosed to American consumers. Consequently, their vehicles were not fit for ordinary use, or intended use, and could not deliver the advertised combination of safety, durability, and reliability that Plaintiffs reasonably relied upon. Plaintiffs and each Class Member suffered concrete injury as a direct and proximate result of FCA's conduct and would not have purchased the Class Vehicle and/or would have paid less for it, had FCA disclosed the defective nature of the Class Vehicles. As deemed appropriate, named Plaintiffs' and each Class Member's ascertainable losses include, but are not limited to, out-of-pocket costs for repair necessitated by the defect (including catastrophic failure and replacement of component parts), payment of a higher price for the Class Vehicles compared to what they would have paid for non-defective vehicles, out-of-pocket losses suffered by overpaying for the vehicles at the time of purchase (or lease), decreased performance of the vehicles, diminished value of the vehicles, and out-of-pocket costs. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive

the benefit of their bargain and bring claims individually and as representatives of the Class.

73.    Each named Plaintiff and/or Class member expected that FCA, via its authorized dealers or through its advertising campaigns, would disclose material facts about the safety, durability, fuel economy, and longevity of its vehicles and the existence of any defect that will result in expensive, non-ordinary repairs and a potential safety hazard. FCA failed to do so.

## III.    VENUE AND JURISDICTION

74.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1332. There is also complete diversity of citizenship in this case because FCA is a citizen of a different state than any of the Plaintiffs, and the amount in controversy exceeds the sum of $75,000. 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

75.    The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive

of interests and costs. Subject matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

76.     This Court has personal jurisdiction over FCA by virtue of FCA transacting and doing business in this District and because FCA is registered to do business in Michigan. FCA has transacted and done business in the State of Michigan and in this District and has engaged in statutory violations and common law tortious conduct in Michigan and in this District.

77.     Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because FCA transacts affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because FCA resides in this judicial District for venue purposes.

## IV.   FACTUAL ALLEGATIONS

### A.   The Class Vehicles contain EGR cooler-equipped EcoDiesel engines.

78.     For purposes of this complaint, the "Class Vehicles" consist of the 2014–2019 model years of the Dodge Ram 1500 pick-up trucks and the 1500 Classic trucks manufactured by FCA and equipped with a 3.0L EcoDiesel engine. All vehicles falling under this Class Vehicle group were manufactured with the

defective EGR cooler and FCA has not provided a fix for a significant number of these vehicles.

**B.    FCA profits from the popularity of EcoDiesel vehicles.**

79.    Diesel trucks have a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pick-ups, and vans, including commercial vehicles, farm trucks, and ambulances.

80.    The 3.0L EcoDiesel engine was developed by VM Motori, an Italian diesel engine manufacturer that has been owned by FCA since 2013.

81.    FCA engaged in a full-court press to market the Class Vehicles, and to communicate to consumers the purported benefits of the EcoDiesel engine. These communication efforts included, among other things: (1) press releases aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Class Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere; (4) information and interactive features on FCA's websites and blogs; and (5) print and television marketing.

82.    As early as 2014, FCA communications to consumers included representations regarding the durability and reliability of the EcoDiesel engine. In

- 32 -

2014 FCA touted the "Aptly branded EcoDiesel, the 3.0-liter powerplant is a turbocharged 60-degree, dual overhead camshaft (DOHC) 24-valve V-6 that produces 240 horsepower and 420 lb.-ft. of torque is more efficient than all V-6 gasoline engines in the half-ton category. This abundant torque from a 3.0-liter engine is the enabler for 9,200 pounds of towing capacity while delivering fuel economy of 28 mpg on the highway."[30]

83.     These representations to consumers intended to, and did in fact, result in significant buzz and media attention for the EcoDiesel vehicles, to which Plaintiffs and Class members were exposed. The representations that resulted were false (because the vehicles contained a defective part) and deceptive (because the vehicles were not durable or reliable, and could not perform as represented due to the fire risk).

## C.     The fragile EGR cooler design

84.     Since 2002, diesel engines have utilized cooled exhaust gas recirculation (EGR) to support meeting United States federal nitrogen oxide emission standards.[31]

---

[30] Ex. 16, https:// media.fcanorthamerica.com/newsrelease.do?id=15880&mid= 69.

[31] Ex. 17, Billy G. Holland, et al., *Modeling Approach to Estimate EGR Cooler Thermal Fatigue Life*, 8 SAE INT'L J. ENGINES 1724–1732 (2015), retrieved from http://www.jstor.org/stable/26278069.

85.     The EGR system works by recirculating a portion of an engine's exhaust gas back to the engine cylinders.[32] This dilutes the $O_2$ in the incoming air stream and provides gases inert to combustion to act as absorbents of combustion heat to reduce peak in-cylinder temperatures.[33]

86.     A key component of the EGR system is the EGR cooler. This component is used to lower the temperature of the exhaust gases that are recirculated by the EGR system.[34]



Image: EGR cooler
Credit: Valeo

87.     This cooler is regularly subjected to high heat.

88.     FCA's EGR cooler is unreasonably fragile in design as it is subject to cracking due to thermal fatigue. This cracking is catastrophic as it can introduce

---

[32] Ex. 18, https://en.wikipedia.org/wiki/Exhaust_gas_recirculation.

[33] *Id.*

[34] Ex. 19, photograph of a vehicle EGR cooler, available at https:// x-engineer .org/automotive-engineering/internal-combustion-engines/ice-components-systems/exhaust-gas-recirculation-egr-complete-guide-components/ (last visited Aug. 20, 2020).

pre-heated vaporized coolant into the vehicle's EGR system while the engine is running. This can result in combustion within the intake manifold, which may lead to a vehicle fire.

89.     The Class Vehicles are unfit for their ordinary use in that they cannot safely and reliably provide transportation and require customers to pay tens of thousands of dollars for a vehicle that is at risk of catastrophic engine fires that can destroy the vehicles and put people in harm's way.

**D.     FCA knew, via repair records, publically available complaints, blogs monitored by FCA, and via industry sources, that the EGR cooler was susceptible to cracking.**

90.     The Class Vehicles contain a defective EGR cooler, which was an internal, hidden component part in the Class Vehicles. Plaintiffs and Class members did not have reason to know at the time of purchase until at least October or November 2019 when FCA announced the recall that this internal component of the Class Vehicles was devastatingly defective to the entire engine system.

91.     However, FCA knew these vehicles were compromised and presented an unreasonable safety risk due to the risk of fire.

92.     By design, EGR coolers are parts that are put under tremendous pressure from heat and need to reliably manage thermal loads.[35]

---

[35] Ex. 17, Holland, *et al*., *supra* n.31, at 1724.

93.     Because of this, FCA was aware, at least as early as 2014, if not
sooner, that the top concern when designing EGR coolers was thermal fatigue,
which can cause EGR coolers to crack and lose coolant and/or result in engine
overheating. FCA was aware of this tendency because FCA had vehicles presented
to it for fixes and fires due to cracked EGR coolers, thermal fatigue design issues
in EGR coolers were well-known within the automobile industry, cracks had
developed in other FCA cars, there were complaints on Ram forum blogs
monitored by FCA, and another manufacturer had announced a recall due to a
similar issue.

94.     A February 2014 article in www.truckinginfo.com entitled "Stay
Ahead of Trouble on EGR Engines" described thermal fatigue as a cause of
leaking in EGR coolers, induced by the expansion and contraction of the
components as the hot exhaust gas flowed through the cooler."[36] The article also
indicated the leak would not be visible externally: "Fleets should be monitoring
coolant consumption. If they find they are adding, say, half a gallon of coolant per
week, but there are no external leaks, that's a good indication of an EGR cooler
with an internal leak."[37]

---

[36] Ex. 20, Jim Park, *Stay Ahead of Trouble on EGR Engines*,
TRUCKINGINFO.COM (Feb. 11, 2014), https://www.truckinginfo.com/154878/stay-
ahead-of-trouble-on-egr-engines.

[37] *Id.*

95.     An April 2014 conference paper entitled "Thermal Strain Characteristics of EGR Cooler" noted that "corrosion resistant material" should be considered to improve the performance of EGR coolers and that "the thermal stress produced by the temperature difference between exhaust gas and coolant" is a "very important factor from the point of safety operation."[38] The paper included figures illustrating thermal strain within the EGR Cooler, including a photo of an actual crack on the inlet header in an EGR Cooler.[39] Experiments showed that "there is a high possibility of the cracks appearance on the left down side of the header due to the thermal shock effects. CFD results also proves that the mentioned area is at a high risk of thermal strain due to the higher temperature difference and lower mass flow rate."[40] The paper identified unequal flow and concentration of flow in the EGR Cooler as a source of strain and discussed how CFD simulations could help predict crack locations and identify designs that would reduce the possibility of cracks.[41]

---

[38] Ex. 38, *Vashani, et al., Thermal and Strain Characteristics of EGR Cooler*, Advanced Science and Technology Letters, Vol. 47 (Healthcare and Nursing 2014), pp. 369-373, April 2014.

[39] *Id.* at 372.

[40] *Id.*

[41] *Id.* at 373.

96.     A 2015 industry paper authored by FCA's 25 year partner on Ram

trucks, Cummins, entitled "Modeling Approach to Estimate EGR Cooler Thermal

Fatigue Life" identified thermal fatigue as a "top concern" in EGR Cooler design.[42]

The authors described a "typical thermal fatigue crack" in an EGR cooler. The

crack starts on the "inside diameter of a given tube and propagates through the

header plate to another tube:



97.     The authors noted that due to the risk of "progressive harm" to the

engine, including the turbocharger and exhaust aftertreatment devices, "the ability

to estimate EGR cooler thermal fatigue prior to production launch is essential so

that engine reliability and customer requirements are met."[43]

98.     This paper tested five EGR coolers to failure, analyzed multiple

specific EGR cooler thermal fatigue field failures, and presented a model for

---

[42] Ex. 17, Holland, *et al.*, *supra* n.31, at 1724.

[43] *Id.* at 1731.

estimating EGR cooler thermal fatigue life.[44] Like the authors of the 2014

conference paper, the authors concluded that thermal stress could concentrate at

the inlet header.[45]

99.    In 2015, another automobile manufacturer acknowledged its EGR

coolers were prone to cracking. The service notice for Behr/HELLA KGaA Hueck

& Co. Lippstadt's 2009 Opel Insignia vehicle noted: "Loss of coolant at the EGR

cooler. The above vehicles can experience a loss of coolant near the exhaust gas

recirculation (EGR cooler). When examining the cooling system, special attention

should be paid to the housing of the EGR cooler. A crack can form leading to a

loss of coolant."[46]

100.   An April 8, 2016 white paper titled "Characterizing Diesel Particulate

Filter Failure During Commercial Fleet Use due to Pinholes, Melting, Cracking

and Fouling" published in "Emission Control Science and Technology" describes

---

[44] *Id.* at 1730–1731.

[45] *Id.* at 1724 ("With EGR cooler gas inlet temperatures in excess of 650˚C and the cyclic nature of EGR flow based on the duty cycle, thermal fatigue at the gas inlet header is a concern.").

[46] Ex. 23, HELLA KGaA, Hueck & Co., Bulletin (2015), https://www.techtips.ie/Hella-Ireland/opel-insignia---loss-of-coolant-at-egr-cooler.pdf.

and provides photographs of EGR coolant leaks that resulted in coolant leaks and ash particles that could contribute to exhaust system corrosion.[47]

101.   FCA was also aware since at least 2016 of vehicles leaking coolant and cracked EGR coolers presented to its dealerships for service. For example, a customer posted online in a Dodge Ram forum on May 31, 2016: "Okay guys, I need some help! Cracked EGR Cooler, dealer wants 3000+tax to replace (out of basic warranty, and my extended doesn't cover it) . . . ."[48]

102.   The issue was also common in online forums and discussions about FCA vehicles, which are monitored by FCA. For example, in June 2016, an owner of a 2014 Ram 1500 Longhorn posted in a Dodge Ram forum: "No evidence of leaks, coolant smell, etc., but truck lost a significant amount of coolant that dealer can't explain where it went."[49] A complaint dated May 22, 2017, in an online Dodge EcoDiesel Ram forum indicated: "I really like my Eco but just got out of the dealer from having an overheating problem. Long story-short, the EGR cooler

---

[47] Ex. 24, Kun Yang, *Characterizing Diesel Particulate Filter Failure During Commercial Fleet Use due to Pinholes, Melting, Cracking and Fouling*, 2 EMISSION CONTROL SCI. & TECH. (Apr. 8, 2016), https://link.springer.com/article/10.1007/s40825-016-0036-0.

[48] Ex. 25, Ccarmichael05, Post #1 on *Cracked EGR Cooler*, RAM1500DIESEL.COM (May 31, 2016), https://www.ram1500diesel.com/threads/cracked-egr-cooler.11744/.

[49] Ex. 39, Hershey1, Post #1 on *Losing Coolant,* June 20, 2016, https://www.carcomplaints.com/Ram/1500/2014/cooling_system/loosing_coolant.shtml.

was leaking internally and had to be replaced. Coolant was being burned off so no external leak was present. At first the engine did not even show a code, so they replaced the thermostat. That lead [sic] to overheating again and this time a code appeared. Hope that is the end of it[.]"[50] This complainant's vehicle had just 35,900 miles on it.[51]

103.   Posts in a Dodge Ram online forum demonstrate that by 2017, FCA's dealers were diagnosing cars with a "faulty EGR cooler" and that the parts used at the time to replace the EGR cooler were on a "national back order": "While waiting for the dealer appointment we went on a 2,000 mile road trip. During the trip we had to add about half a gallon of Mopar coolant every 500 miles. Today was our date with the dealer. After pressure testing the system and not observing any external leaks, the dealer concluded that it must be a faulty EGR cooler. Unfortunately, the replacement EGR cooler is on a national back order at Chrysler. So, they sent us home and told us they will call us when the EGR becomes available. How long and how much can I continue driving the truck with a leaking EGR cooler (just topping off the tank every 500 miles)? Can that ruin anything in

---

[50] Ex. 26, KWC, Post #1 on *EGR Cooler leaking*, ECODIESELRAM.COM (May 22, 2017), https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.

[51] *Id.* at Post #3.

- 41 -

the engine? Can it leave be stranded in the middle of nowhere (we are planning another road trip)?"[52]

104.   Another Dodge Ram online forum complaint from September 2017 indicates "We just had our leaking EGR cooler replaced under warranty. Only 22000 miles on the engine. I hope this is the only problem we have. I really love this truck."[53]

105.   Another Dodge Ram 1500 online forum complaint notes "Glad to hear they are supporting you. I have a 2015 with the same 100,000 coverage but they said it's not covered under powertrain. No rental, loaner or help paying the $3100 charge to replace EGR and EGR cooler."[54]

106.   FCA also knew since at least 2016 about smoke and fire caused by EGR cooler failure.

107.   A June 2016 complaint to NHTSA indicated a 2014 Ram 1500 experienced a catastrophic failure and visible black smoke:

> NHTSA ID Number: 10874286
> Incident Date June 5, 2016

---

[52] Ex. 27, TzarIgor, Post #112 on *Are you slowly loosing coolant?*, RAM1500DIESEL.COM (June 26, 2017), https://www.ram1500diesel.com/threads/are-you-slowly-loosing-coolant-possible-egr-cooler-leak.8287/page-6.

[53] Ex. 26, bullet317, Post #14 on *EGR Cooler leaking*, ECODIESELRAM.COM (Sept. 19, 2017), https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.

[54] *Id.*, Apks, Post #19 on *EGR Cooler leaking*, ECODIESELRAM.COM (Oct. 17, 2017), https://www.ecodieselram.com/forum/threads/egr-cooler-leaking.1384/.

Location: Simpsonville, SC
Vehicle Identification Number 1C6RR6LM7ES****

CATASTROPHIC EXHAUST GAS RECORD VALVE
(EGR) AND EGR COOLER FAILURES WHICH
RESULTED IN PLASTIC INTAKE MANIFOLD
FAILURE. EGR COOLER SEVERELY PLUGGED
WITH SOOT/CARBON WELL BELOW MILEAGE
PERIOD OF FEDERAL EMISSIONS WARRANTY.
NO SPECIFIED SERVICE REQUIREMENTS FOR
THIS EGR SYSTEM. DAMAGE RESULTED IN
SUBSTANTIAL LOSS OF POWER, UNABLE TO
MAINTAIN MINIMUM SPEED ON INTERSTATE 85
WHEN INTAKE MANIFOLD FAILURE OCCURRED.
VISIBLE BLACK SMOKE/SOOT WAS BEING
EMITTED FROM EXHAUST UNDER
ACCELERATION DURING THIS FAILURE,
CLEARLY NOT IN COMPLIANCE WITH
EMISSIONS STANDARDS.

108.   A June 2018 complaint to NHTSA indicated an FCA dealership

diagnosed an EGR system failure as the cause of a fire in a 2014 Ram 1500 truck:

NHTSA ID Number: 11099511
Incident Date June 1, 2018
Consumer Location JEFFERSON CITY, MO
Vehicle Identification Number 1C6RR7VM1ES****

TL* THE CONTACT OWNS A 2014 RAM 1500.
WHILE DRIVING AT AN UNKNOWN SPEED,
SMOKE AND FLAMES APPEARED FROM THE
ENGINE COMPARTMENT. A POLICE REPORT
WAS NOT FILED AND NO INJURIES WERE
SUSTAINED. THE FLAMES WERE EXTINGUISHED
AND THE VEHICLE WAS TOWED TO CAPITOL
CHRYSLER DODGE JEEP RAM (3201 MISSOURI
BLVD, JEFFERSON CITY, MO 65109, (573) 893-5000)
WHERE IT WAS DIAGNOSED THAT THE
EXHAUST GAS RECIRCULATION SYSTEM
FAILED, AND THE WIRING HARNESS AND

> INTAKE AND EXHAUST MANIFOLDS NEEDED TO
> BE REPLACED. THE MANUFACTURER WAS
> CONTACTED AND DID NOT ASSIST. THE
> FAILURE MILEAGE WAS 74,000.

109.    An owner of a Dodge Ram 2014 EcoDiesel posted in 2018 of his

February 2017 truck fire: "I bought a Ram 1500 EcoDiesel 2014 last January. The

engine caught fire while I was pulling a RV on the I95. By the time we put out the

fire too much damage was done and the truck was scrapped by the Insurance. The

fire started at the rear top of the engine on passenger side and quickly spread to the

driver side. We have no clue as to what caused that." He later posted that he

suspected the cause was leaking antifreeze or leaking fuel, and had noticed a liquid

leaking from the intake manifold.[55]

110.    An owner of a 2016 Ram 1500 Tradesman posted on an online forum

of a fire approximately one year after the unspecified date of purchase: "Our 2016

Ram 1500 Tradesman just caught on fire while driving it. Chrysler/Ram

investigated and said it was no fault of theirs. The truck was one year old with

17,500 miles on it. Started under hood front left side. Was gone in 10 minutes. We

had just had it completely checked, oil change, etc. for a trip we were taking.

Chrysler won't do a thing!"[56]

---

[55] Ex. 40, https://www.cargurus.com/Cars/Discussion-c10415_ds519785.

[56] *Id.*

111.   FCA was also aware of the issue due to BMW's 2018 recall of EGR coolers due to fire risk. The recall, like FCA's eventual recall, was based on the admission that cooling fluid could leak and melt the intake manifold, increasing the risk of a fire.[57] An investigative team of 32 experts concluded that faulty EGR valves were the cause of engine fire, BMW admitted the fire risk, and was fined for its delayed recall.[58]

## E.   Investigation and recall

112.   Despite FCA's knowledge as early as 2014 of the tendency of EGR coolers to crack due to thermal fatigue, and the need to implement design features to mitigate this risk, it was not until May 22, 2019, that FCA's Vehicle Safety and Regulatory Compliance ("VSRC") organization opened an investigation into the issue.[59]

113.   By the time of the investigation, FCA was aware of engine compartment fires in Ram 1500 3.0L Eco Diesel trucks.[60]

---

[57] Ex. 28, May 2019 BMW owner notification letter, https://static.nhtsa.gov/odi/rcl/2018/RCONL-18V755-1720.pdf.

[58] Ex. 41, https://www.koreatimes.co.kr/www/tech/2019/01/419_260887.html.

[59] Ex. 29, FCA US LLC Chronology, 2014-2019 Ram 1500 Eco Diesel Engine Compartment (submitted Oct. 24, 2019), https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V757-6098.pdf.

[60] *Id.*

- 45 -

114.    FCA's investigation between May 24, 2019 and June 2019, determined that a number of Dodge Ram 1500 3.0L Eco Diesel fires reported to the company had originated in the general vicinity of the center of the engine compartment.[61]

115.    The vehicles examined by FCA showed holes in the intake manifold.[62]

116.    By October 11, 2019, FCA was aware of injuries relating to EGR cooler failures, and was aware of 61 field reports related to EGR cooler failure, 1,289 CAIRs, and a total of 8,909 EGR cooler warranty replacements reports.[63]

117.    FCA finally admitted at the time of its October 2019 EGR cooler recall that the EGR cooler was susceptible to thermal fatigue.[64]

118.    FCA also admitted that this "[t]hermal fatigue may cause the cooler to crack internally over time."[65]

119.    FCA also admitted that the EGR cooler can crack and cause a fire.[66]

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *See* Ex. 1 ("Some 2014–2019MY Ram 1500/1500 Classic ('Ram 1500') vehicles equipped with the 3.0L Eco Diesel engine, may have been built with Exhaust Gas Recirculation ('EGR') coolers that are susceptible to thermal fatigue.").

[65] *Id.*

[66] Ex. 30, FCA Press Release, *Statement: EGR Cooler* (Oct. 25, 2019), https://media.fcanorthamerica.com/newsrelease.do?id=21315&mid=1 ("Such reports prompted an internal investigation that discovered microscopic cracks in some

120.    FCA admitted a fire was a safety hazard to vehicle occupants and
bystanders.[67]

## F.    Subsequent failure to act

121.    At the time of the recall, FCA represented that all affected vehicle
owners would have the EGR cooler replaced with a new EGR cooler that is not
susceptible to thermal fatigue.[68]

122.    While some impacted owners have received a fix, remarkably, over 10
months after the announcement of this recall, a considerable portion of owners of
affected vehicles have been left with no recourse for this defect that renders the
vehicle unsafe, and presents an unreasonable risk to vehicle occupant safety, and
no option for returning their trucks.

123.    FCA notified dealerships that a fix is available for the 2014–2016
model years[69] and notified owners that "it is extremely important to take steps now

---

Exhaust Gas Recirculation (EGR) coolers. If these microscopic cracks are present,
coolant may escape and – in rare circumstances – pose an engine fire risk.").

[67] *See* Ex. 2.

[68] Ex. 1 ("FCA US will conduct a voluntary safety recall on all affected vehicles
to replace the EGR cooler with a new EGR cooler (part number 68483334AA) hat
is not susceptible to thermal fatigue. In the event the intake manifold is damaged,
the intake manifold will be replaced.").

[69] *See* Ex. 34, FCA Dealer Service Instruction "Revision 1 May 2020"
(available at https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V757-5258.pdf)
(indicating remedy is available for 2014-2015 models), and Ex. 6, FCA Dealer
Service Instruction "Revised May 2020" (available at https:// static. nhtsa. gov/odi/
rcl/2019/RCRIT-19V757-8953.pdf) (adding 2016 model year as a year the remedy

- 47 -

to repair your vehicle to ensure the safety of you and your passengers." Yet owners

of these model years are still routinely being told a fix is not available:

> NHTSA ID Number: 11331819
> Incident Date June 30, 2020
> Consumer Location HARLINGEN, TX
> Vehicle Identification Number 1C6RR6LM7GS****
>
> TL* THE CONTACT OWNS A 2016 RAM 1500. THE
> CONTACT RECEIVED NOTIFICATION OF NHTSA
> CAMPAIGN NUMBER: 19V757000 (ENGINE AND
> ENGINE COOLING) HOWEVER, THE PART TO DO
> THE RECALL REPAIR WAS UNAVAILABLE. THE
> CONTACT STATED THAT THE MANUFACTURER
> EXCEEDED A REASONABLE AMOUNT OF TIME
> FOR THE RECALL REPAIR. BERT OGDEN
> CHRYSLER DODGE JEEP RAM (8421 W. EXPY 83,
> HARLINGEN, TX 78552, (956) 335-3018) WAS
> CONTACTED AND CONFIRMED THAT PARTS
> WERE NOT AVAILABLE FOR THE RECALL
> REPAIR. THE MANUFACTURER WAS NOT
> NOTIFIED OF THE ISSUE. THE CONTACT HAD
> NOT EXPERIENCED A FAILURE. VIN TOOL
> CONFIRMS PARTS NOT AVAILABLE.
>
> NHTSA ID Number: 11330406
> Incident Date June 22, 2020
> Consumer Location SAN JOSE, CA

---

is available for). Ex. 7, Amendment 5 to FCA's Part 573 Safety Recall Report
dated April 2, 2020, introduced a phased final mailing campaign for the 2016–
2019 model years for Phase 2 – 2016 model years (or before May 7, 2020) and for
Phase 3 – 2017–2019 model years (or about May 28, 2020). Ex. 35, Amendment 6
(available at https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V757-6689.PDF),
changed the timeframe: Phase 2 for the 2016 model year would start on or about
May 28, 2020) and Phase 3 for the 2017–2019 model years would start on or about
June 18, 2020). Ex. 36, Amendment 7 (available at https:// static. nhtsa. gov/odi/rcl
/2019/RCLRPT-19V757-7169.PDF), reset the timing to the Amendment 5
deadlines.

Vehicle Identification Number 3C6JR7DM3EG****

RECEIVED RECALL NOTICE VB1 TO REPLACE
EGR COOLER THAT MAY CAUSE ENGINE FIRE.
THE RECALL SAYS THAT PARTS ARE
AVAILABLE. I CONTACTED 2 DEALER AND HAD
CHAT WITH FCA DIRECTLY. ALL OF THEM TOLD
ME THAT PARTS ARE NOT AVAILABLE. NEITHER
DEALER WOULD GIVE ME AN APPOINTMENT
DATE AND SAID THAT THERE WERE MANY
AHEAD OF ME. FCA SAID THAT PARTS ARE
ALLOCATED AT 1 SET OF PARTS PER DEALER
PER WEEK.

THE BOTTOM LINE IS THAT THESE TRUCKS ARE
AT RISK FOR FIRE THAT COULD RESULT IN
INJURY, BUT FCA IS NOT RESPONSIVE BY THE
FACT THAT THE PARTS ARE NOT AVAILABLE.

NHTSA ID Number: 11329574
Incident Date May 1, 2020
Consumer Location SYLACAUGA, AL
Vehicle Identification Number 1C6RR7PM9GS****

TL* THE CONTACT OWNS A 2016 RAM 1500. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 19V757000 (ENGINE AND
ENGINE COOLING) HOWEVER, THE PART TO DO
THE RECALL REPAIR WAS UNAVAILABLE. THE
CONTACT CALLED TO MCSWEENEY CHRYSLER
DODGE JEEP RAM (2605 DR JOHN HAYNES DR,
PELL CITY, AL 35125; (205) 813-7020) WHERE IT
WAS CONFIRMED THAT THE PART WAS NOT
AVAILABLE. THE CONTACT STATED THAT THE
MANUFACTURER EXCEEDED A REASONABLE
AMOUNT OF TIME FOR THE RECALL REPAIR.
THE MANUFACTURER HAD NOT BEEN MADE
AWARE OF THE ISSUE. THE CONTACT HAD NOT
EXPERIENCED A FAILURE. PARTS DISTRIBUTION
DISCONNECT.

NHTSA ID Number: 11340956
Incident Date October 24, 2019
Consumer Location SEQUIM, WA
Vehicle Identification Number 1C6RR7NM5HS****

TL* THE CONTACT OWNS A 2017 RAM 1500. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 19V757000 (ENGINE AND
ENGINE COOLING). THE CONTACT CALLED THE
WILDER CHRYSLER JEEP DODGE RAM DEALER
LOCATED AT 53 JETTA WAY, PORT ANGELES,
WA 98362, AND IT WAS CONFIRMED THAT THE
PARTS WERE NOT YET AVAILABLE. THE
CONTACT STATED THAT THE MANUFACTURER
EXCEEDED A REASONABLE AMOUNT OF TIME
FOR THE RECALL REPAIR. THE MANUFACTURER
WAS MADE AWARE OF THE ISSUE. THE
CONTACT HAD NOT EXPERIENCED A FAILURE.
PARTS DISTRIBUTION DISCONNECT.

NHTSA ID Number: 11340466
Incident Date July 20, 2020
Consumer Location MURRAY, KY
Vehicle Identification Number 1C6RR7NM7HS****

TL* THE CONTACT OWNS A 2017 RAM 1500. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 19V757000 (ENGINE AND
ENGINE COOLING) HOWEVER, THE PART TO DO
THE RECALL REPAIR WAS UNAVAILABLE. THE
CONTACT STATED THAT THE MANUFACTURER
EXCEEDED A REASONABLE AMOUNT OF TIME
FOR THE RECALL REPAIR. THE DEALER DAVID
TAYLOR CHRYSLER-DODGE-JEEP-RAM-FIAT
(2052 US-641, MURRAY, KY 42071) WAS
CONTACTED AND CONFIRMED THAT PARTS
WERE NOT YET AVAILABLE. THE
MANUFACTURER WAS NOT MADE AWARE OF
THE ISSUE. THE CONTACT HAD NOT
EXPERIENCED A FAILURE. VIN TOOL CONFIRMS
PARTS NOT AVAILABLE.

- 50 -

NHTSA ID Number: 11338371
Incident Date June 12, 2020
Consumer Location EAGLE, WI
Vehicle Identification Number 1C6RR7NM9HS****

TL* THE CONTACT OWNS 2017 RAM 1500. THE
CONTACT RECEIVED RECALL NOTIFICATION
FOR NHTSA CAMPAIGN NUMBER: 19V757000
(ENGINE AND ENGINE COOLING). HOWEVER,
THE PARTS TO DO THE REPAIR WERE
AVAILABLE. THE CONTACT STATED THAT THE
MANUFACTURER EXCEEDED A REASONABLE
AMOUNT OF TIME FOR THE RECALL REPAIR.
THE DEALER LYNCH CHEVROLET OF
MUKWONAGO (280 E WOLF RUN, MUKWONAGO,
WI 53149) WAS CONTACTED AND STATED THE
PARTS WERE ON BACKORDER FOR THE RECALL
REMEDY. THE MANUFACTURER WAS NOT
NOTIFIED OF THE ISSUE. THE CONTACT STATED
THAT SEVERAL MONTHS AFTER HE RECEIVED
THE RECALL NOTIFICATION, THE VEHICLE
STALLED WHILE DRIVING AT AN UNKNOWN
SPEED. THE CONTACT WAS ABLE TO PULL TO
THE SIDE OF THE ROAD AND TURN THE
VEHICLE OFF. AN UPON OPENING THE HOOD
THE CONTACT NOTICED FLAMES AROUND THE
ENGINE CORDS AND WIRE. THE CONTACT
STATED HE WAS ABLE TO EXTINGUISH THE
FIRE HIMSELF WITH WATER. THE VEHICLE WAS
TOWED TO LYNCH CHEVROLET OF
MUKWONAGO FOR DIAGNOSTIC TESTING AND
REPAIRS. THE FAILURE MILEAGE WAS
APPROXIMATELY 58,000. PART DISTRIBUTION
DISCONNECT.

124. Another owner wrote in a Dodge Ram forum: "I received a recall

notice from FCA stating that a faulty EGR cooler can cause fires and is a safety

concern. The recall also states that parts are available. I have contacted several

Ram dealers and they all tell me that parts are on back order and that each dealer only gets one set of parts per week. I was also told that it may be as long as 6-8 months before my truck can be addressed. Mine is not an isolated incident. As a member of a Ram forum of 17K members, this is an frequent complaint. Since Ram knows that this is a safety issue that could cause a fire, they should be either repairing the vehicles or providing loaner transportation until such time as the repair can be made."[70]

125.   Owners of the 2017–2019 model years have not been notified of an available fix yet.

**G.    The EGR cooler defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles *per se* defective.**

126.   The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

---

[70] Ex. 42, Owner in San Jose, CA, Post #187, https://www.carcomplaints. com/ Ram/1500/2014/engine/engine.shtml.

127.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *See United States v. Gen. Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five (5) days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicle does not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

128.    Based on its duty to monitor safety-related complaints or concerns, FCA assuredly saw scores of consumer complaints regarding the EGR cooler failure.

129.    Defendant had notice of the defect via replacement part sales and warranty repair requests, indirect complaints from customers through online fora, NHTSA complaints, other automobile makers, industry sources including articles and whitepapers, and testing and investigations.

## H.    FCA concealed, both affirmatively and via omission, the defective nature of the EGR cooler.

130.    At least from 2014 through 2019, FCA has extensively advertised the benefits of the EcoDiesel engine located within all of the Class Vehicles. At all times relevant to this action, FCA omitted and/or concealed the EGR cooler defect. At no point during the period relevant to this action did FCA inform buyers and/or lessees of the Class Vehicles that the EGR cooler could crack and lead to an engine fire. FCA represented that the Class Vehicles were free from defect and advertised that they are durable and reliable, but this is not true.

131.    In so doing, FCA led consumers, including Plaintiffs and the putative Class members, to believe that the Class Vehicles would be free from defects that result in loss of power and engine fire.

- 54 -

132.    FCA claimed that its 2014 Dodge Ram EcoDiesel vehicles were durable, touting that "the available 3.0L EcoDiesel V6 utilizes dual-filtration technology for greater . . . durability."[71]

133.    *In its EcoDiesel advertising, FCA specifically targets consumers "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."[72]*

134.    FCA claims that the EcoDiesel engine has best-in-class torque: "The EcoDiesel engine delivers best-in-class 420 lb-ft of torque. Paired with an impressive 240 horsepower, this engine has serious muscle."[73]

135.    Other online advertisements proclaim that the Dodge Ram 1500 EcoDiesel is "expected to deliver an outstanding combination of best-in-class fuel efficiency, best-in-class torque and impressive capability. This new EcoDiesel is among today's most advanced diesel engines. Has emissions that are 60% lower

---

[71] Ex. 31, 2014 Dodge Ram Commercial eBrochure, at 4, available at https://www.ramtrucks.com/assets/pdf/brochures/14MY_Ram_Commercial_eBrochure.pdf.

[72] Ex. 32, *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, RAM ZONE (Ram trucks blog operated by FCA US LLC) (July 16, 2013), available at https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[73] *Id.*

than those produced by diesel powertrains 25 years ago. The impressive combination of torque and fuel economy marks a new level of performance."[74]

## I.   FCA routinely denies responsibility for fixes, both by denying warranty claims, and by denying that truck fires are due to the EGR cooler defect.

136.   FCA routinely denies warranty claims relating to leaking coolant and cracked hoses. One impacted owner described how his claim was denied even though his truck developed a visible split in the coolant hose at just 72,000 miles:

> I recently had my first major issue with my ecodiesel and felt like I should share it with you all. Maybe some of you have experienced the same thing. So at 72k miles my engine decided to spring a major coolant leak. I first noticed the leak when backing into my driveway, noticed a trail of water. I jumped out of my truck to investigate. Water was running from the back of the motor and down the trans bellhousing. By the time I shut the truck off there was almost no coolant left in the motor. I'm lucky it happened when it did. I spent a few hours trying to diagnose where the coolant was coming from. With no avail I chose to have to have it towed to the nearest dealer. It took the mech a few days to diagnose what failed and allowed me to come to the shop to check it out. As some of you may know there is a coolant line that is in the valley of the motor that comes from the drivers side head and feeds to the turbo or formally called the turbo water feed tube. This tube is made up of two hard lines that are connected by a rubber heater hose. The heater hose split! To access this absolutely terrible engineering design the intake manifold had to be removed. Now why would they put a standard heater hose in one of the most hottest parts of the motor? I understand they need flex but they could have used something of better quality, maybe something that could withstand

---

[74] Ex. 33, *The 2014 Ram 1500 EcoDiesel, First of Its Kind Light-Duty Diesel Pickup*, RAM ZONE (Ram trucks blog operated by FCA US LLC) (Feb. 14, 2013), available at https://blog.ramtrucks.com/features/the-2014-ram-1500-ecodiesel-first-of-its-kind-light-duty-diesel-pickup/index.html.

heat better like a silicon hose or designed the hose to run on the outside of the motor.[75]

137.   The owner described FCA as useless:

"I contacted FCA directly, they were useless. they stated that since this part has rubber hose and 'rubber' items are only covered for 36k miles that I was sol on any warranty covering the repair." This owner was charged a total of $2,054.90 for the fix. This owner also complained that the needed part was not available.[76]

138.   Another owner whose 2015 Ram 1500 EcoDiesel caught on fire posted:

Last week (10/3/17) my 2015 Ecodiesel with 46k miles engine caught on fire. While driving and towing and empty equipment trailer at highway speed ( 55mph ) the engine began to make high pitched knocking noises, followed by partial power, and the truck started decelerating as the engine rpms dropped, then stalled. I re-started the truck and the idle seemed normal, no check engine lights displayed, I was wondering if it was a fuel filter issue causing a lean air/fuel mix or computer issue and began to drive again but quickly realized there was no power, and poor acceleration. The engine began to decrease speed and again stalled, but this time gray, then black smoke came into the cabin through the air vents, and black smoke started rolling out of the front grill and hood seams. Black smoke that smelled like burning diesel in addition to plastic. Quickly adding up the senses produced the fact that I had an engine compartment fire. I happened to have a good sized fire extinguisher in the trailer hitch tool box, without much delay in realizing car fires spread quick and not wanting a fire bomb on the US Route 20 bridge overpass to NYS Route 88, I opened the hood with pin pulled extinguisher in hand and noticed black smoke and flames coming directly from under the plastic cover at the center top of the engine (the one that covers up the fuel and injector lines). I was able to extinguish the fire in short order. Shaken up a little as this is a first for

---

[75] Ex. 43, Feb 20, 2018 post by CR128,
https://www.ecodieselram.com/forum/threads/turbo-water-coolant-feed-tube-failure.1743/.

[76] *Id.*

me, I called for a towing company to take the truck to the dealership. The dealership started to look at it the following morning, they were told to stop work repair until Chrysler could send an investigator.[77]

139.   He described FCA's failure to honor his warranty or take any

responsibility:

Monday 10/9/17 an investigator examined the truck. I received a letter today from "Mr. Kon" stating that the investigation result has led them to believe that the fire was not due to manufacturing responsibility. No additional details were offered or disclosed as to cause and would not be offered if requested as that information is proprietary. The truck is entirely stock, no modifications, and has been serviced regularly at the dealership where purchased. No assistance will be offered by Fiat Chrysler of any sort and this will not be covered by the warranty. The cost is on me. I lodged a complaint at several levels today. Chrysler could care less and offers no avenue for discussion. The dealership is shaking their heads in disbelief of the letter. No parts were taken for examination or study (melted wiring harness, melted fuel hoses/lines), without any detail provided, it appears the investigation was entirely superficial. The truth is I want to know why did this happen? It is not normal order to have an engine catch on fire. If there is a 3rd party cause, then what happened? There are many thousands of Ram 1500 Ecodiesel trucks driven daily, at this point I am led to believe each of us have a genuine risk of a fire under the hood above and beyond what is deemed acceptable. Statistically this could be a real rarity or it could be just the beginning and a matter of time for all of these trucks to catch fire. Fiat Chrysler will not pay to repair this engine fire despite still being well within the power train warranty time frame, Fiat Chrysler will not pay partial expense, will not offer to pay for something as simple as a loaner car till the repair is complete, they will not buy the burned vehicle back, they will not communicate any further on the matter. If by choice I will not purchase any FCA vehicle, and based on my experience- I would seriously question anyone in the public buying

---

[77] Ex. 44, EcoFire October 12, 2017 Post #6, https://www.ram1500diesel.com/threads/engine-fire-and-fc-says-not-responsible. 45737/#post-679529.

their product from Chrysler. An engine fire in a 2015 model year 46,000 mile diesel fueled truck under warranty that will not be covered by the manufacturer is not normal. Any other engine fires out there???[78]

**J.     FCA also misrepresented that loaner vehicles would be provided to impacted owners.**

140.   FCA not only concealed the defect, denied warranty claims, claimed it was not at fault after fire investigators, and told owners a fix was available when it was not. In yet another example of FCA's standard business practice of profits over safety, FCA is routinely denying some requests for loaner cars pending a fix, forcing impacted truck owners back on the road. Not only this, FCA also actively misrepresented that loaner cars would be provided for all concerned owners.

141.   In December 2019 FCA released an instruction indicating "if the vehicle does not currently need any repairs, and the customer is still concerned for their safety, please provide the customer with a loaner vehicle until such time that the remedy for the recall is available."[79]

142.   But this isn't happening: "My truck started leaking coolant out the rear of engine down transmission and on the ground and motor wouldn't hold any coolant in it so I called FCA customer care and they told me vehicle is not driveable to get it to Ram dealership for repairs it's been sitting there 9 days now

---

[78] *Id.*

[79] *See* Ex. 8.

and I cant get anybody from dealer or customer care to get it worked on and diagnosed it's under factory warranty plus the EcoDiesel settlement extended warranty coverage for all parts of possible problem and they will not loan me a vehicle of any kind and I'm in need of my vehicle repaired and back to being able to drive it, I call Ram customer care every day and keep getting told nothing about it getting repaired or problem located."[80]

143.    Another affected owner posted in a Dodge Ram 1500 EcoDiesel forum that he filed a NHTSA complaint and asked FCA for a rental car until the fix was available, and was told "we can't authorize a rental car."[81]

**K.    FCA continued to sell vehicles with the subject coolers after the announcement of the recall.**

144.    Compounding the danger further, FCA continues to sell vehicles with this known issue. This continues to put owners and their families at risk:

---

[80] Ex. 46, Jan. 14, 2020, Owner of Dodge Ram 1500 with 98,215 miles, Lake City, FL, USA, Post #164, https://www.carcomplaints.com/Ram/1500/2014/engine/engine-2.shtml.

[81] "I filed a complaint to NHTSA and got a claim # and I also contacted FCA regarding a rental car until the fix and their response was 'we can't authorize a rental car' and I said I would be furious if my 2016 Ecodiesel burns to the ground when it could have been avoided. I recently added approved coolant and have driven less than 50 miles and the coolant level is already low, this is bullshit that I have to monitor coolant level on a daily basis. All the dealerships that I've contacted said EGR cooler is on backorder. I almost wish I would have bought a gas motor, this is bullshit!!!!" Ex. 47, Post by Bobcope399, December 24, 2019, Post #119, https://www.ecodieselram.com/forum/threads/engine-fire.3227/page-6#post-27807.

"So, I just purchased a 2015 eco around 1 month ago from a dealer. Truck has 37,000 miles on it. I obviously have not received any recall letter for this large issue. What I've been reading on this thread, is the engine starts to loses power first? I have a 5 y/o who is still in a car seat, so I want to know the first sign. I contacted the dealer and they said they would contact me when parts are available for the recall. Does anyone know when parts are available? Also how can a Ram dealership sell a vehicle with this type of recall pending?"[82]

L.    **FCA has a long pattern of turning its back on owners before and after recalls.**

145.    After all these abject failures and misrepresentations, FCA owners are left in an impossible situation with no recourse. Owners of the vehicles have not much more to do than to continue to warn each other about the danger in the hopes to get the word out and save lives. As one owner posted, "On Friday, 03 January 2020, my EcoDiesel succumbed to the VB1 recall fire - EGR Cooler failure. Within 90 seconds, the fire was too much for me to logically be anywhere near that truck anymore. If you smell smoke, get everybody out and get away immediately."[83] He went on to write: "Mine took only 90 seconds from the time the truck stopped—I immediately smelled smoke—until the fire was visible and I had to stop trying to get anything else out of the truck. Total loss and thank God I was alone when it happened. If you are driving an EcoDiesel, prepare for this to

---

[82] *Id.*, Post #13, Dec. 18, 2019 post by AndyIRV, https://www.ecodieselram. com/forum/threads/engine-fire.3227/page-6#post-27807.

[83] Ex. 48, Deward, posted 7 months prior, https:// www. ram1500diesel.com/ members/deward.38134/.

happen at a moment's notice. If you are losing coolant, get it in to the dealer now. Document it. Demand a loaner vehicle. I will not drive or let anybody I know get in another ED unless it is a 2020. Yes, it is that serious. Life and death serious."[84]

146. Unfortunately this not the first time FCA has turned its back on owners requesting a fix. In fact, this seems to be FCA's standard business practice, based on an examination of its approach to recalls and service bulletins since at least 2014.

### 1.    2014 NHTSA investigation.

147. In October 2014, NHTSA announced it was opening an investigation into Chrysler's recall of Dodge Ram trucks for steering issues. NHTSA had received over 1,000 complaints from owners seeking faster repairs, which included reports that owners could not obtain service appointments and were being told it would be many months before the dealership could secure a replacement part for their vehicle.[85]

---

[84] *Id.*

[85] Ex. 45, https://www.detroitnews.com/story/business/autos/chrysler/2014/10/26/nhtsa-investigates-pace-dodge-ram-truck-recall-fixes/17957315/.

010939-11/1336705 V1

## 2.   2014 lack of availability of basic parts.

148.   This foot-dragging extends not just to recall fixes but to basic, critical

parts. As an owner of a 2014 Dodge Ram 1500 4WD posted on

CarComplaints.com in December 2014:

> ". . . check engine light came on. I took it to dealer and they said it was
> O2 sensor. They reset it and told me to blow 3.0 diesel engine out.
> Check engine light came back on as well as a message that def fluid
> was wrong. I called dealer and they said bring it back in. Dealer called
> me back and said I needed new catalytic converter but it was on back
> order and they couldn't give me a date. Dealer told me truck was ok to
> drive. December 24, 2014 a warning message came up on truck that
> said truck would cut off in 190 miles and would not re start. Dealer now
> has truck and still can't give me a date on when it will be fixed. They
> did tell me that there were 82 other trucks in the system like mine. There
> is an issue with the 3.0 ecodiesel engine and Chrysler has no fix or won't
> tell anyone what is happening."[86]

## 3.   Frustrating delays implementing a TSB relating to a cooler hose fix.

149.   Impacted owners also experienced frustrating delays relating to FCA's

Technical Service Bulletin relating to a cooler hose fix in 2013/2014. As one

owner indicated:

> Initially, the vehicle had an abnormally strong new car smell. (the smell
> has now been widely reported on internet forums by other owners.) I
> thought this would dissipate over time. The smell was so strong that I
> had to leave the windows open while driving due to a nauseating odor.
> After sitting in the vehicle, occupants could actually taste some type of
> residue. In addition, a foul odor came from the heating system,

---

[86] Ex. 21, Owner of 2014 Dodge Ram 1500 4WD, Fayetteville, NC, Post #4,
https://www.carcomplaints.com/Ram/1500/2014/engine/engine_and_engine_cooli
ng.shtml.

especially at idle. After two months of ownership, and frustration, I took the vehicle to the dealership (although I had mentioned the strong odor before during a follow-up call). The dealership flushed the cooling system and replaced the hoses because of a technical service document. The document stated there was a chemical reaction between a new type of coolant and the interior lining of coolant hoses. Unfortunately, this procedure did not eliminate the foul smell experienced while driving. I noticed the odor was strongest once the engine warmed, so it took longer to surface during cold temperatures. I took the vehicle back to the dealership and they said I should call the manufacturer. My initial call was placed over a month ago. An additional coolant system flush was performed, but yielded no results. I have been sent to different divisions within Chrysler, and have mostly experienced frustrating delays and inaccurate data entry. I've visited the dealership a total of four times, and spent hours on the phone with the manufacturer regarding this problem. It seems the odor is being pulled in from the engine bay. The best way to describe the odor is as some type of chemical finish or residue entering the cabin. My vehicle is for family use. I feel extremely uncomfortable in the vehicle because of the actual odor and potential health risks.[87]

### 4.     Parts unavailable for 2015 recall fix on Ram 1500

150.   Owners of Ram 1500s were also turned away after the 2015 recall on Ram 1500s (NHTSA 15V51700). For example, an owner of a 2014 Dodge Ram 1500 posted on carcomplaints.com in October 2015 that she received notification of the 2015 recall, and took the car to the dealer repeatedly, only to be told each time that a part was not available.[88]

---

[87] *Id.*, Owner of 2014 Dodge Ram 1500, Macomb, MI, Post #5, https://www. carcomplaints.com/Ram/1500/2014/engine/engine_and_engine_cooling.shtml.

[88] "The contact owns a 2014 Ram 1500. The contact received notification of NHTSA campaign number: 15V517000 (electrical system, engine and engine cooling). The part was not available within a reasonable time frame to schedule the recall repair. The vehicle was taken to the dealer more than three times and stated

**M.    Allegations Establishing Agency Relationship Between Manufacturer FCA And FCA Dealerships**

151.   An agency relationship existed and exists between FCA and FCA dealerships. Upon information and belief, Manufacturer Defendant FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

i.    Manufacturer FCA can terminate the relationship with its dealers at will.

ii.   The relationships are indefinite.

iii.  Manufacturer FCA is in the business of selling vehicles as are its dealers.

iv.   Manufacturer FCA provides tools and resources for FCA dealers to sell vehicles.

v.    Manufacturer FCA supervises its dealers regularly.

vi.   Without Manufacturer FCA, the relevant FCA dealers would not exist.

vii.  Manufacturer FCA requires the following of its dealers:

---

that the part was available. When the contact arrived at the dealer for the repair, she was informed that the part was not available for the vehicle to be repaired. The dealer did not give a specific date for when the part would become available. The manufacturer could not provide an estimated date for when the contact's vehicle would receive the recall repair. The contact had not experienced a failure." *See* Ex. 22, October 12, 2015, Lindale, TX, Post #42, https://www.carcomplaints.com/Ram/1500/2014/engine/engine-8.shtml.

1.    Reporting of sales;

2.    Computer network connection with Manufacturer FCA;

3.    Training of dealers' sales and technical personnel;

4.    Use of Manufacturer FCA-supplied computer software;

5.    Participation in Manufacturer FCA's training programs;

6.    Establishment and maintenance of service departments in FCA dealerships;

7.    Certification of FCA pre-owned vehicles;

8.    Reporting to Manufacturer FCA with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.    Displaying Manufacturer FCA logos on signs, literature, products, and brochures within FCA dealerships.

viii.   Dealerships bind Manufacturer FCA with respect to:

1.    Warranty repairs on the vehicles the dealers sell; and

2.    Issuing service contracts administered by Manufacturer FCA.

ix.   Manufacturer FCA further exercises control over its dealers with respect to:

1.    Financial incentives given to FCA dealer employees;

2.    Locations of dealers;

3.    Testing and certification of dealership personnel to ensure compliance with Manufacturer FCA's policies and procedures; and

4.     Customer satisfaction surveys, pursuant to which Manufacturer FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

x.     FCA dealers sell FCA vehicles on Manufacturer FCA's behalf, pursuant to a "floor plan," and Manufacturer FCA does not receive payment for its cars until the dealerships sell them.

xi.     Dealerships bear FCA's brand names, use FCA's logos in advertising and on warranty repair orders, post FCA-brand signs for the public to see, and enjoy a franchise to sell Manufacturer FCA's products, including the Class Vehicles.

xii.     Manufacturer FCA requires FCA dealers to follow the rules and policies of Manufacturer FCA in conducting all aspects of dealer business, including the delivery of Manufacturer FCA's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.     Manufacturer FCA requires its dealers to post FCA's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized FCA dealers and servicing outlets for Manufacturer FCA cars.

xiv.     Manufacturer FCA requires its dealers to use service and repair forms containing Manufacturer FCA's brand names and logos.

xv.     Manufacturer FCA requires FCA dealers to perform Manufacturer FCA's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer FCA.

xvi.     Manufacturer FCA requires FCA dealers to use parts and tools either provided by Manufacturer FCA, or approved by Manufacturer FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of Manufacturer FCA's vehicles.

xvii.     Manufacturer FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA-brand vehicles.

xviii.   Manufacturer FCA audits FCA dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.   Manufacturer FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer FCA's vehicles.

xx.   Manufacturer FCA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines and repair procedures to be followed for chronic defects.

xxi.   Manufacturer FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer FCA to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Manufacturer FCA requires FCA-brand vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

xxiii.   FCA dealers are required to notify Manufacturer FCA whenever a car is sold or put into warranty service.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

152.   As of the date of this complaint, FCA continues to market its vehicles based on superior durability and reliability, despite its knowledge that the Class Vehicles are defective, have catastrophically failed, or can catastrophically fail, and continues to represent that a remedy is readily available for the EGR cooler recall.

153.   Plaintiffs and Class members did not discover and could not reasonably have discovered prior to purchase that their Class Vehicles are defective, that the durability and performance of their Class Vehicles is impaired

by this defect, and that such durability and performance is far less than FCA

promised, or that, as a result of the foregoing, they overpaid for their vehicles, the

value of their vehicles is diminished, their vehicles were unsafe, and/or their

vehicles will require costly modification to avoid a catastrophic, even more costly

failure, and that any such modifications would impair other qualities of the Class

Vehicles that formed a material part of the bargain between the parties in the

purchase of the Class Vehicles by Plaintiffs and Class members.

154.   With respect to Class Vehicles that experienced a catastrophic EGR

cooler crack prior to the recall, Plaintiffs and Class members did not discover and

could not reasonably have discovered their EGR cooler failure.

155.   With respect to Class Vehicles that experienced a catastrophic EGR

cooler crack after the recall, Plaintiffs and Class members did not discover and

could not reasonably have known that FCA would not provide a fix for their EGR

cooler failure.

156.   Until the announcement of the botched recall, Plaintiffs and putative

Class members had no way of knowing about FCA's wrongful and deceptive

conduct with respect to their defective Class Vehicles. After the recall, FCA falsely

represented that all EGR coolers would be replaced given that 100% were

impacted by the recall, did not tell owners that only those that were cracked would

be fixed, and did not tell owners that the parts needed for the fix would not be

available for a significant segment of vehicle owners impacted by the recall.

## VI.   CLASS ACTION ALLEGATIONS

157.   Throughout this complaint, "Class Vehicle" is defined as FCA-

manufactured 2014–2019 Dodge Ram 1500 EcoDiesel Trucks and 1500 Classic

Trucks, which did not and have not received an updated EGR cooler part

purportedly free from defect.

158.   Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following

Class and Subclasses:

> **The Nationwide Class:**
>
> All persons or entities in the United States who purchased or
> leased one or more of the Class Vehicles.
>
> **The California Subclass:**
>
> All persons or entities who purchased or leased one or more of
> the Class Vehicles in the State of California.
>
> **The Hawaii Subclass:**
>
> All persons or entities who purchased or leased one or more of
> the Class Vehicles in the State of Hawaii.
>
> **The Idaho Subclass:**
>
> All persons or entities who purchased or leased one or more of
> the Class Vehicles in the State of Idaho.

010939-11/1336705 V1

**The Kansas Subclass:**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Kansas.

159.   Plaintiffs assert claims under the laws of each state set forth below.

160.   Excluded from the Class and Subclasses are individuals who have personal injury claims resulting from an EGR cooler failure. Also excluded from the Class and Subclasses is FCA and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which FCA has a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class and Subclasses. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

161.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

162.   The Class Representatives are asserting claims that are typical of the claims of Class and Subclass member, and they will fairly and adequately represent and protect the interests of the Class and Subclasses in that they have no interests antagonistic to those of the putative Class and SubClass members.

163.   The amount of damages suffered by each individual member of the
Class, in light of the expense and burden of individual litigation, would make it
difficult or impossible for individual Class and SubClass members to redress the
wrongs done to them. Plaintiffs and Class members have all suffered harm and
damages as a result of FCA's unlawful and wrongful conduct. Absent a class
action, FCA will likely not have to compensate victims for FCA's wrongdoings
and unlawful acts or omissions, and will continue to commit the same kinds of
wrongful and unlawful acts or omissions in the future. Indeed, upon information
and belief, FCA continues to deny claims and recall fixes relating to the EGR
cooler and thus continues ongoing misrepresentations to the Class.

164.   **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The
Class and Subclasses are so numerous that individual joinder of all of its members
is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs
believe that the total number of Class and SubClass members is at least in the
thousands, and are numerous and geographically dispersed across the country.
While the exact number and identities of the Class and SubClass members is
unknown at this time, such information can be ascertained through appropriate
investigation and discovery, as well as by the notice Class members will receive by
virtue of this litigation so that they may self-identify. The disposition of the claims
of Class and SubClass members in a single class action will provide substantial

benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed who are citizens of these United States effectively exhausts the membership of the class.

165. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether FCA engaged in the conduct alleged herein;

b. Whether FCA knew about the EGR cooler defect and the inherent problems related thereto, and if so, how long FCA knew or should have known as much;

c. Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce within the United States;

d. Whether the diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e. Whether FCA omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f. Whether FCA designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate EGR cooler;

g.      Whether FCA's conduct violates states' consumer protection
        statutes and constitutes breach of contract or warranty and
        fraudulent concealment as asserted herein;

h.      Whether Plaintiffs and the SubClass members overpaid for their
        vehicles at the point of sale or lease; and

i.      Whether Plaintiffs and SubClass members are entitled to
        damages and other monetary relief and, if so, what amount.

166.    **Typicality under Federal Rule of Civil Procedure 23(a)(3):**

Plaintiffs' claims are typical of the Class and SubClass members' claims because

all have been comparably injured through FCA's wrongful conduct as described

above.

167.    **Adequacy of Representation under Federal Rule of Civil**

**Procedure 23(a)(3):** Plaintiffs are adequate Class Representatives because their

interests do not conflict with the interests of Class and SubClass members they

seek to represent. Additionally, Plaintiffs have retained counsel with substantial

experience in handling complex class action and multi-district litigation. Plaintiffs

and their counsel are committed to prosecuting this action vigorously on behalf of

Class and SubClass members and have the financial resources to do so. The

interests of Class and SubClass members will be fairly and adequately protected by

Plaintiffs and their counsel.

168.    **Superiority of Class Action under Federal Rule of Civil Procedure**

**23(b)(3):** A class action is superior to any other available means for the fair and

efficient adjudication of this controversy, and no unusual difficulties are likely to

010939-11/1336705 V1

be encountered in the management of this class action. The financial detriment

suffered by Plaintiffs and the other members of the Class and Subclasses are

relatively small compared to the burden and expense that would be required to

individually litigate their claims against FCA. Accordingly, it would be

impracticable for the members of the Class and Subclasses to individually seek

redress for FCA's wrongful conduct. Even if members of the Class and Subclasses

could afford individual litigation, the court system could not. Individualized

litigation creates a potential for inconsistent or contradictory judgments and

increases the delay and expense to all parties and the court system. By contrast, the

class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision

by a single court.

## VII.   CAUSES OF ACTION

**A.     Claims brought on behalf of the Nationwide Class**

### COUNT I

### VIOLATIONS OF 15 U.S.C. § 2301, *ET SEQ.* THE MAGNUSON-MOSS WARRANTY ACT

169.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

170.   This claim is brought on behalf of the Nationwide Class.

171.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

172.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

173.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

174.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

175.   FCA warranty provided to owners and lessees of the Class Vehicles is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

176.   FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire, leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by FCA.

177.   Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships and technical support) to

010939-11/1336705 V1

establish privity of contract between FCA on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

178.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

179.   At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

180.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all

payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

181.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

182.   Plaintiffs, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

**B.      Claims brought on behalf of the California Subclass**

### COUNT I

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

183.   Plaintiffs (for purposes of all California Subclass member Counts) incorporate by reference all paragraphs as though fully set forth herein.

184.   Plaintiffs bring this Count on behalf of the California SubClass members against FCA.

185.   FCA is a "person" under Cal. Civ. Code § 1761(c).

186.   Plaintiffs and the California Subclass are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

- 78 -

187.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). FCA has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; advertising the Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving the Class Vehicles has been supplied in accordance with a previous representation when it has not.

188.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the EGR cooler was defective, such that normal use of the Class Vehicles would cause coolant to leak and disperse throughout the vehicle's engine, leading to catastrophic engine failure and a fire. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

189.    In purchasing or leasing the Class Vehicles, Plaintiffs and the California SubClass members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles causes coolant to leak and disperse into the engine, leading to catastrophic engine failure and a vehicle fire.

190.    Plaintiffs and California SubClass members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the California SubClass members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicle's EGR cooler is an internal part in the Class Vehicles, and Plaintiffs and California SubClass members were not aware of the defective nature of the EGR cooler prior to purchase or lease.

191.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

192.    Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

193.   Defendant intentionally and knowingly misrepresented material facts

regarding the Class Vehicles with intent to mislead Plaintiffs and the California

SubClass members.

194.   Defendant knew or should have known that its conduct violated the

California law regarding unfair or deceptive acts in trade or commerce.

195.   Defendant owed Plaintiffs and California SubClass members a duty to

disclose the truth about the EGR cooler defect because Defendant:

> a.   Possessed exclusive knowledge of the design of the Class
> Vehicles and the tendency of EGR coolers to crack, including
> warranty claims relating to cracked EGR coolers;

> b.   Intentionally concealed the foregoing from Plaintiffs and the
> California SubClass members; and/or

> c.   Made incomplete representations regarding the quality and
> durability of the Class Vehicles, while purposefully
> withholding material facts from Plaintiffs and the California
> SubClass members that contradicted these representations.

196.   Due to its specific and superior knowledge that the EGR coolers in the

Class Vehicles can crack, its false representations regarding the increased

durability of the Class Vehicles, and Plaintiffs' and California SubClass members'

reliance on these material representations, FCA had a duty to disclose to Plaintiffs

and California SubClass members that the EGR coolers were defective, that Class

Vehicles do not have the expected durability over other diesel vehicles or of their

namesake predecessor engines, that failure of the EGR cooler will cause damage to

Class Vehicle engines and engine systems and could pose a safety hazard due to fire, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and California SubClass members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and California SubClass members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. FCA represented to Plaintiffs and California SubClass members that they were purchasing or leasing vehicles that were free from defect, when in fact a cracked EGR cooler can create a ticking time bomb and leak coolant into a running engine, and it is only a matter of time before catastrophic failure occurs. Defendant also later represented that a fix was available for the EGR cooler defect.

197.   Defendant's conduct proximately caused injuries to Plaintiffs and the California SubClass members.

198.   Plaintiffs and the California SubClass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the California SubClass members overpaid for their Class Vehicles and did not receive the benefit of their bargain,

and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

199.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

200.   As a direct and proximate result of FCA US LLC's violations of the CLRA, Plaintiffs and the California SubClass members have suffered injury-in-fact and/or actual damage.

201.   Under Cal. Civ. Code § 1780(a), Plaintiffs and the California SubClass members seek monetary relief against FCA measured as the diminution of the value of their vehicles caused by FCA's violations of the CLRA as alleged herein.

202.   Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against FCA of up to $5,000 for each California Subclass member who qualifies as a "senior citizen" or "disabled person" under the CLRA. FCA knew or should have known that its conduct was directed to one or more California SubClass members who are senior citizens or disabled persons. FCA's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set

- 83 -

aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California SubClass members who are senior citizens or disabled persons are substantially more vulnerable to FCA's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from FCA conduct.

203.   Plaintiffs also seek punitive damages against FCA because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Subclass to potential cruel and unjust hardship as a result. FCA intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only FCA knew. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

204.   Plaintiffs further seek an order enjoining FCA's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code§ 1780(e), and any other just and proper relief available under the CLRA.

205.   Certain Plaintiffs have sent a letter complying with Cal. Civ. Code § 1780(b).

010939-11/1336705 V1

## COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

206.    Plaintiffs (for purposes of all California Subclass member Counts) incorporate by reference all paragraphs as though fully set forth herein.

207.    Plaintiffs bring this Count on behalf of the California SubClass members against FCA.

208.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." FCA has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

209.    FCA violated the unlawful prong of § 17200 by the following:

210.    FCA represented to Plaintiffs and California SubClass members that they were purchasing or leasing vehicles that were free from defect, when in fact a cracked EGR cooler can create a ticking time bomb and leak coolant into a running engine, and it is only a matter of time before catastrophic failure occurs. Defendant also later represented that a fix was available for the EGR cooler defect.

211.    Defendant had a duty to disclose that the Class Vehicle contained a fundamental defect as alleged herein, because Plaintiffs and the California SubClass members relied on Defendant's material representations.

- 85 -

212.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the EGR cooler defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect as well as the subsequent recall. This made Defendant's other disclosures about the Class Vehicles deceptive.

213.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the California SubClass members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and California SubClass members.

214.   FCA's violations present a continuing risk to Plaintiffs and California SubClass members, as well as to the general public. Its unlawful acts and practices complained of herein affect the public interest.

215.   As a direct and proximate result of FCA's violations of the UCL, Plaintiffs and the California Subclass have suffered injury-in-fact and/or actual damage.

216.   Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that FCA has violated the UCL; an order enjoining FCA from continuing its unfair, unlawful, and/or deceptive practices; an order and judgment restoring to the California SubClass

members any money lost as the result of FCA's unfair, unlawful, and deceptive

trade practices, including restitution and disgorgement of any profits FCA received

as a result of its unfair, unlawful, and/or deceptive practices, as provided in Cal.

Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code

§ 3345; and for such other relief as may be just and proper.

## COUNT III

### FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

217.   Plaintiffs (for purposes of all California Subclass member Counts)

incorporate by reference all paragraphs as though fully set forth herein.

218.   Plaintiffs bring this Count on behalf of the Nationwide class and the

California SubClass members against FCA.

219.   As set forth above, Plaintiffs and the putative Class have suffered

from a defect that existed in the Class Vehicles at the time of purchase.

220.   FCA intentionally concealed that the Class Vehicles are defective.

221.   As alleged above, FCA further affirmatively misrepresented to

Plaintiffs, in advertising and other forms of communication, including standard and

uniform material provided with each Class Vehicle and on its website, that the

Class Vehicles they were selling had no significant defects, that the Class Vehicles

were safe, reliable, durable, and of high quality, and would perform and operate in

a safe manner. FCA further affirmatively misrepresented to Plaintiffs that a recall fix was readily available for the Class Vehicles when it was not.

222.   Defendant knew about the defect in the Class Vehicle when these representations were made.

223.   The Class Vehicles purchased by Plaintiffs and the other Class members contained defective EGR coolers.

224.   Defendant had a duty to disclose that the Class Vehicle contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Defendant's material representations.

225.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the EGR cooler defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect as well as the subsequent recall. This made Defendant's other disclosures about the Class Vehicles deceptive.

226.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the other SubClass members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and SubClass members.

227.   Plaintiffs and the other SubClass members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and SubClass members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and SubClass members by concealing the true facts about the presence of a defect in the Class Vehicles and concealing true facts about the subsequent recall of the Class Vehicles.

228.   Defendant's false representations and omissions were material to consumers because they concerned the safety of the Class Vehicle, which played a significant role in the value of the Class Vehicle.

229.   Defendant had a duty to disclose the EGR cooler defect and violations with respect to the Class Vehicles, as well as the lack of a remedy, because they concerned the safety of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or SubClass members.

230.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of Class Vehicles, without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

010939-11/1336705 V1

231.    Defendant's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the EGR cooler defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and SubClass members.

232.    Defendant has still not made full and adequate disclosures and continue to defraud Plaintiffs and SubClass members by concealing material information regarding the defect and recall in the Class Vehicles.

233.    Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for Class Vehicles with the EGR cooler defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and SubClass members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or SubClass members.

234.    Because of the concealment and/or suppression of facts, Plaintiffs and SubClass members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of Class Vehicles. Had Plaintiffs and SubClass members been aware of the

EGR cooler defect, and Defendant's disregard for the truth, Plaintiffs and SubClass members would have paid less for their Class Vehicles or would not have purchased them at all.

235.   The value of Plaintiffs' and SubClass members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the EGR cooler defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

236.   Accordingly, Defendant is liable to Plaintiffs and SubClass members for damages in an amount to be proven at trial.

237.   Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and SubClass members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## REACH OF EXPRESS WARRANTY

238.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

239.  Defendant was a merchant with respect to motor vehicles.

240.  In selling its vehicles, FCA expressly warranted in advertisements that its vehicles were free from defect, reliable and durable.

241.  These affirmations and promises were part of the basis of the bargain between the parties.

242.  Defendant breached these warranties arising from its advertisements, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire, leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by FCA.

243.  As a direct and proximate cause of FCA's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

### COUNT V

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)

244.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

245.  Plaintiffs bring this Count on behalf of the California SubClass members against FCA.

- 92 -

246.    Plaintiffs and the California Subclass are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

247.    The Class Vehicles are "consumer goods" within the meaning of Civ. Code § 1791(a).

248.    FCA was a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

249.    FCA impliedly warranted to Plaintiffs and the California Subclass that FCA-branded Class Vehicles sold or leased were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

250.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

- 93 -

251.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the EGR coolers are defective, as they can crack, leading coolant to leak into a running engine, which can cause a fire (a condition that FCA knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

252.   As a direct and proximate result of FCA's breach of its duties under California's Lemon Law, Plaintiffs and the California Subclass received goods whose dangerous condition substantially impairs their value. Plaintiffs and the California SubClass members have been damaged by the diminished value of their vehicles, the product's defect, and the loss of use of their Class Vehicles.

253.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and California SubClass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

254.   Under Cal. Civ. Code § 1794, Plaintiffs and the California Subclass are entitled to costs and attorneys' fees.

010939-11/1336705 V1

## COUNT VI

## BREACH OF CONTRACT
## (BASED ON CALIFORNIA LAW)

255.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

256.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the California Subclass.

257.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

258.   FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's concealment and suppression of material facts concerning the durability, performance and quality of the Class Vehicles, and FCA's affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles, caused Plaintiffs and the other Class members to make their purchases or leases of their Trucks.

259.   Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective EGR cooler. Accordingly, Plaintiffs and the other SubClass members overpaid for their Trucks and did not receive the benefit of the bargain.

- 95 -

260.   Each and every sale or lease of a Truck constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability and reliability of the Class Vehicles, as well as the presence of a defect in the Class Vehicles, and by affirmatively making misleading statements concerning the durability and reliability of the Class Vehicles, as well as the fact that a remedy was available for the EGR cooler defect.

261.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VII

## UNJUST ENRICHMENT

262.   Plaintiffs (for purposes of all California Subclass member Counts) incorporate by reference all paragraphs as though fully set forth herein.

263.   Plaintiffs bring this Count on behalf of the California SubClass members against FCA.

264.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and California SubClass members.

265.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the EGR cooler and the Class Vehicles and the concealment thereof, FCA charged a higher price for the Class Vehicles than the Vehicles' true value and FCA, therefore, obtained monies that rightfully belong to Plaintiffs and California SubClass members.

266.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and California SubClass members, who paid a higher price for their vehicles that actually had lower values.

267.   FCA has received and retained unjust benefits from the Plaintiffs and California SubClass members, and inequity has resulted.

268.   Thus, all Plaintiffs and California SubClass members conferred a benefit on FCA.

269.   It would be inequitable and unconscionable for FCA to retain these wrongfully obtained benefits.

270.   Because FCA concealed its fraud and deception, Plaintiffs and California SubClass members were not aware of the true facts concerning the Class Vehicles and did not benefit from FCA's misconduct.

271.   FCA knowingly accepted and retained the unjust benefits of its fraudulent conduct.

272.    As a result of FCA's misconduct, the amount of its unjust enrichment

should be disgorged and returned to Plaintiffs and California SubClass members,

in an amount to be proven at trial. Plaintiffs and California SubClass members,

therefore, seek an order establishing FCA as a constructive trustee of the profits

unjustly obtained, plus interest.

### C.    Claims brought on behalf of the Hawaii Subclass

### COUNT I

### UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW (HAW. REV. STAT. ANN. § 480, *ET SEQ.*)

273.    Plaintiffs (for purposes of all Hawaii Subclass member Counts)

incorporate by reference all paragraphs as though fully set forth herein.

274.    Plaintiffs bring this Count on behalf of the Hawaii SubClass members

against FCA.

275.    Haw. Rev. Stat. Ann. § 480-2(a) prohibits "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce."

276.    FCA is a "person" under Haw. Rev. Stat. Ann. § 480-1.

277.    Plaintiffs and Hawaii SubClass members are "consumer[s]" as defined

by Haw. Rev. Stat. Ann. § 480-1, who purchased or leased the Class Vehicles.

278.    In the course of Defendant's business, it willfully failed to disclose

and actively concealed that the EGR cooler was defective, such that normal use of

the Class Vehicles would cause coolant to leak and disperse throughout the

vehicle's engine, leading to catastrophic engine failure and a fire. Particularly in

light of Defendant's advertising campaign, a reasonable American consumer

would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in

unlawful trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in

connection with the sale of the Class Vehicles.

279.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Hawaii

SubClass members were deceived by Defendant's failure to disclose that normal

use of the Class Vehicles causes coolant to leak and disperse into the engine,

leading to catastrophic engine failure and a vehicle fire.

280.   Plaintiffs and Hawaii SubClass members reasonably relied upon

Defendant's false misrepresentations. They had no way of knowing that

Defendant's representations were false and gravely misleading. As alleged herein,

Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and

the Hawaii SubClass members did not, and could not, unravel Defendant's

deception on their own, as the Class Vehicle's EGR cooler is an internal part in the

Class Vehicles and Plaintiffs were not aware of the defective nature of the EGR

cooler prior to purchase or lease.

281.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

282.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

283.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Hawaii SubClass members.

284.   Defendant knew or should have known that its conduct violated the Hawaii law regarding unfair or deceptive acts in trade or commerce.

285.   Defendant owed Plaintiffs and Hawaii SubClass members a duty to disclose the truth about the EGR cooler defect because Defendant:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of EGR coolers to crack, including warranty claims relating to cracked EGR coolers;

b.   Intentionally concealed the foregoing from Plaintiffs and the Hawaii SubClass members; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Hawaii SubClass members that contradicted these representations.

286.   Due to its specific and superior knowledge that the EGR coolers in the Class Vehicles can crack, its false representations regarding the increased

- 100 -

durability of the Class Vehicles, and Plaintiffs' and Hawaii SubClass members'

reliance on these material representations, FCA had a duty to disclose to Plaintiffs

and Hawaii SubClass members that the EGR coolers were defective, that the Class

Vehicles do not have the expected durability over other diesel vehicles or of their

namesake predecessor engines, that failure of the EGR cooler will cause damage to

Class Vehicle engines and engine systems and could pose a safety hazard due to

fire, and that Plaintiffs and Hawaii SubClass members would be required to bear

the cost of the damage to their vehicles. Having volunteered to provide information

to Plaintiffs and Hawaii SubClass members, FCA had the duty to disclose not just

the partial truth, but the entire truth. These omitted and concealed facts were

material because they directly impact the value of the Class Vehicles purchased or

leased by Plaintiffs and Hawaii SubClass members. Longevity, durability,

performance, and safety are material concerns to diesel truck consumers. FCA

represented to Plaintiffs and Hawaii SubClass members that they were purchasing

or leasing vehicles that were free from defect, when in fact a cracked EGR cooler

can create a ticking time bomb and leak coolant into a running engine, and it is

only a matter of time before catastrophic failure occurs. Defendant also later

represented that a fix was available for the EGR cooler defect.

287.   Defendant's conduct proximately caused injuries to Plaintiffs and the

Hawaii SubClass members.

288.    Plaintiffs and the Hawaii SubClass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the SubClass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

289.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

290.    Pursuant to Haw. Rev. Stat. Ann. § 480-13, Plaintiffs and Hawaii SubClass members seek monetary relief against FCA measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

## COUNT II

## BREACH OF EXPRESS WARRANTY

291.    Plaintiffs incorporate by reference all allegations as though fully set forth herein.

292.    Defendant was a merchant with respect to motor vehicles.

- 102 -

293.   In selling its vehicles, FCA expressly warranted in advertisements that its vehicles were free from defect, reliable and durable.

294.   These affirmations and promises were part of the basis of the bargain between the parties.

295.   Defendant breached these warranties arising from its advertisements, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire, leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by FCA.

296.   As a direct and proximate cause of FCA's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (HAW. REV. STAT. ANN. § 490:2-314)

297.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

298.   Plaintiffs bring this Count on behalf of the Hawaii SubClass members against FCA.

299.   FCA was a merchant with respect to motor vehicles within the meaning of the Haw. Rev. Stat. Ann. § 490:2-104(1).

- 103 -

300.   Under Haw. Rev. Stat. Ann. § 490:2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and Hawaii SubClass members purchased or leased their Class Vehicles from FCA.

301.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the EGR coolers are defective, as they can crack, leading coolant to leak into a running engine, which can cause a fire (a condition that FCA knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

302.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Hawaii SubClass members have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUDULENT CONCEALMENT
## (BASED ON HAWAII LAW)

303.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

304.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Hawaii Subclass.

305.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide, based upon the common law in each state.

306.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

307.   FCA intentionally concealed that the Class Vehicles are defective.

308.   As alleged above, FCA further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and would perform and operate in a safe manner. FCA further affirmatively misrepresented to Plaintiffs that a recall fix was readily available for the Class Vehicles when it was not.

309.   Defendant knew about the defect in the Class Vehicles when these representations were made.

310.   The Class Vehicles purchased by Plaintiffs and the other Class members contained defective EGR coolers.

311.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Defendant's material representations.

- 105 -

312.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the EGR cooler defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect as well as the subsequent recall. This made Defendant's other disclosures about the Class Vehicles deceptive.

313.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the other Class members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class members.

314.   Plaintiffs and the other Class members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class members by concealing the true facts about the presence of a defect in the Class Vehicles and concealing true facts about the subsequent recall of the Class Vehicles.

315.   Defendant's false representations and omissions were material to consumers because they concerned the safety of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

010939-11/1336705 V1

316.    Defendant had a duty to disclose the EGR cooler defect and violations with respect to the Class Vehicles, as well as the lack of a remedy, because they concerned the safety of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

317.    Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class Vehicles, without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

318.    Defendant's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the EGR cooler defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class members.

319.    Defendant has still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defect and recall in the Class Vehicles.

320.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for the Class Vehicles with the EGR cooler defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

321.   Because of the concealment and/or suppression of facts, Plaintiffs and Class members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of the Class Vehicles. Had Plaintiffs and Class members been aware of the EGR cooler defect, and Defendant's disregard for the truth, Plaintiffs and Class members would have paid less for their Class Vehicles or would not have purchased them at all.

322.   The value of Plaintiffs' and Class members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the EGR cooler defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

323.    Accordingly, Defendant is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

324.    Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## BREACH OF CONTRACT
## (BASED ON HAWAII LAW)

325.    Plaintiffs incorporate by reference all allegations as though fully set forth herein.

326.    Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Hawaii Subclass.

327.    As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

328.    FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's concealment and suppression of material facts concerning the durability, performance and quality of the Class Vehicles, and FCA's affirmative misrepresentations touting the increased durability and

performance qualities of the Class Vehicles, caused Plaintiffs and the other Class members to make their purchases or leases of their Trucks.

329.   Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective EGR cooler. Accordingly, Plaintiffs and the other Class members overpaid for their Trucks and did not receive the benefit of the bargain.

330.   Each and every sale or lease of a Truck constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability and reliability of the Class Vehicles, as well as the presence of a defect in the Class Vehicles, and by affirmatively making misleading statements concerning the durability and reliability of the Class Vehicles, as well as the fact that a remedy was available for the EGR cooler defect.

331.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

D. **Claims brought on behalf of the Idaho Subclass**

## COUNT I

### VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CIV. CODE § 48-601 *ET SEQ.*)

332. Plaintiffs (for purposes of all Idaho Subclass member Counts) incorporate by reference all paragraphs as though fully set forth herein.

333. Plaintiffs bring this Count on behalf of the Idaho SubClass members against FCA.

334. FCA is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"). Idaho Civ. Code § 48-602(1).

335. FCA's acts or practices as set forth above and herein occurred in the conduct of "trade" or "commerce" under Idaho Civ. Code § 48-602(2).

336. Idaho Civ. Code § 48-603 prohibits deceptive business practices including but not limited to: (1) representing that the Class Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they do not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

337.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the EGR cooler was defective, such that normal use of the Class Vehicles would cause coolant to leak and disperse throughout the vehicle's engine, leading to catastrophic engine failure and a fire. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

338.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Idaho SubClass members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles causes coolant to leak and disperse into the engine, leading to catastrophic engine failure and a vehicle fire.

339.   Plaintiffs and Idaho SubClass members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Idaho SubClass members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicle's EGR cooler is an internal part in the Class

Vehicles and Plaintiffs were not aware of the defective nature of the EGR cooler prior to purchase or lease.

340.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

341.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

342.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Idaho SubClass members.

343.   Defendant knew or should have known that its conduct violated the Idaho law regarding unfair or deceptive acts in trade or commerce.

344.   Defendant owed Plaintiffs and Idaho SubClass members a duty to disclose the truth about the EGR cooler defect because Defendant:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of EGR coolers to crack, including warranty claims relating to cracked EGR coolers;

b.   Intentionally concealed the foregoing from Plaintiffs and the Idaho SubClass members; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Idaho SubClass members that contradicted these representations.

345.   Due to its specific and superior knowledge that the EGR coolers in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and Idaho SubClass members' reliance on these material representations, FCA had a duty to disclose to Plaintiffs and Idaho SubClass members that the EGR coolers were defective, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the EGR cooler will cause damage to Class Vehicle engines and engine systems and could pose a safety hazard due to fire, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Idaho SubClass members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Idaho SubClass members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. FCA represented to Plaintiffs and Idaho SubClass members that they were purchasing or leasing vehicles that were free from defect, when in fact a cracked EGR cooler can create a ticking time bomb and leak coolant into a running engine, and it is only a matter of time before catastrophic failure occurs. Defendant also later represented that a fix was available for the EGR cooler defect.

346.   Defendant's conduct proximately caused injuries to Plaintiffs and the Idaho SubClass members.

347.   Plaintiffs and the SubClass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Idaho SubClass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

348.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

349.   Plaintiffs and Idaho SubClass members seek the greater of $1,000 or actual ascertainable damages, including out-of-pocket and/or benefit of the bargain, attorneys' fees and any other just and proper relief available under the Idaho CPA.

350.   Under Idaho Civ. Code § 48-608(2) Plaintiffs seek an additional award against FCA of up to $15,000, or treble damages, whichever is greater, for each Idaho Subclass member who qualifies as a "senior citizen" or "disabled

person" under the Idaho CPA. FCA knew or should have known that its conduct was directed to one or more Idaho SubClass members who are senior citizens or disabled persons. FCA's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Idaho SubClass members who are senior citizens or disabled persons are substantially more vulnerable to FCA's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from FCA conduct.

351. Plaintiffs and Idaho SubClass members also seek punitive damages against FCA because FCA's conduct evidences an extreme deviation from reasonable standards. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON IDAHO LAW)

352. Plaintiffs incorporate by reference all allegations as though fully set forth herein.

353. Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Idaho Subclass.

010939-11/1336705 V1

354.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide, based upon the common law in each state.

355.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

356.   FCA intentionally concealed that the Class Vehicles are defective.

357.   As alleged above, FCA further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and would perform and operate in a safe manner. FCA further affirmatively misrepresented to Plaintiffs that a recall fix was readily available for the Class Vehicles when it was not.

358.   Defendant knew about the defect in the Class Vehicles when these representations were made.

359.   The Class Vehicles purchased by Plaintiffs and the other Class members contained defective EGR coolers.

360.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Defendant's material representations.

- 117 -

361.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the EGR cooler defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect as well as the subsequent recall. This made Defendant's other disclosures about the Class Vehicles deceptive.

362.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the other Class members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class members.

363.   Plaintiffs and the other Class members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class members by concealing the true facts about the presence of a defect in the Class Vehicles and concealing true facts about the subsequent recall of the Class Vehicles.

364.   Defendant's false representations and omissions were material to consumers because they concerned the safety of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

365.   Defendant had a duty to disclose the EGR cooler defect and violations with respect to the Class Vehicles, as well as the lack of a remedy, because they concerned the safety of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

366.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class Vehicles, without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

367.   Defendant's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the EGR cooler defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class members.

368.   Defendant has still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defect and recall in the Class Vehicles.

010939-11/1336705 V1

369.   Plaintiffs and Class members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased or paid as much for the Class Vehicles with the EGR cooler defect,

and/or would have taken other affirmative steps in light of the information

concealed from them. Plaintiffs' and Class members' actions were justified.

Defendant was in exclusive control of the material facts, and such facts were not

generally known to the public, Plaintiffs, or Class members.

370.   Because of the concealment and/or suppression of facts, Plaintiffs and

Class members sustained damage because they own Class Vehicles that are

diminished in value as a result of Defendant's concealment of the true safety and

quality of the Class Vehicles. Had Plaintiffs and Class members been aware of the

EGR cooler defect, and Defendant's disregard for the truth, Plaintiffs and Class

members would have paid less for their Class Vehicles or would not have

purchased them at all.

371.   The value of Plaintiffs' and Class members' Class Vehicles have

diminished as a result of Defendant's fraudulent concealment of the EGR cooler

defect, which has made any reasonable consumer reluctant to purchase a Class

Vehicle, let alone pay what otherwise would have been fair market value for the

Class Vehicle.

372.   Accordingly, Defendant is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

373.   Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF EXPRESS WARRANTY

374.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

375.   Defendant was a merchant with respect to motor vehicles.

376.   In selling its vehicles, FCA expressly warranted in advertisements that its vehicles were free from defect, reliable and durable.

377.   These affirmations and promises were part of the basis of the bargain between the parties.

378.   Defendant breached these warranties arising from its advertisements, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire,

leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by FCA.

379.   As a direct and proximate cause of FCA's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT IV

## BREACH OF CONTRACT
## (BASED ON IDAHO LAW)

380.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

381.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Idaho Subclass.

382.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

383.   FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's concealment and suppression of material facts concerning the durability, performance and quality of the Class Vehicles, and FCA's affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles, caused Plaintiffs and the other Class members to make their purchases or leases of their Trucks.

384.   Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective EGR cooler. Accordingly, Plaintiffs and the other SubClass members overpaid for their Trucks and did not receive the benefit of the bargain.

385.   Each and every sale or lease of a Truck constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability and reliability of the Class Vehicles, as well as the presence of a defect in the Class Vehicles, and by affirmatively making misleading statements concerning the durability and reliability of the Class Vehicles, as well as the fact that a remedy was available for the EGR cooler defect.

386.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## UNJUST ENRICHMENT

387.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

388.   Plaintiffs bring this Count on behalf of the Idaho SubClass members against FCA.

389.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and Idaho SubClass members.

390.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the EGR cooler and the Class Vehicles and the concealment thereof, FCA charged a higher price for the Class Vehicles than the Vehicles' true value and FCA, therefore, obtained monies that rightfully belong to Plaintiffs and Idaho SubClass members.

391.   FCA enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Idaho SubClass members, who paid a higher price for their vehicles that actually had lower values.

392.   FCA has received and retained unjust benefits from the Plaintiffs and Idaho SubClass members, and inequity has resulted.

393.   Thus, all Plaintiffs and Idaho SubClass members conferred a benefit on FCA.

010939-11/1336705 V1

394.   It would be inequitable and unconscionable for FCA to retain these wrongfully obtained benefits.

395.   Because FCA concealed its fraud and deception, Plaintiffs and Idaho SubClass members were not aware of the true facts concerning the Class Vehicles and did not benefit from FCA's misconduct.

396.   FCA knowingly accepted and retained the unjust benefits of its fraudulent conduct.

397.   As a result of FCA's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Idaho SubClass members, in an amount to be proven at trial. Plaintiffs and Idaho SubClass members, therefore, seek an order establishing FCA as a constructive trustee of the profits unjustly obtained, plus interest.

**E.   Claims brought on behalf of the Kansas Subclass**

**COUNT I**

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
(KAN. STAT. ANN. § 50-623 *ET SEQ.*)**

398.   Plaintiffs (for purposes of all Kansas Subclass member Counts) incorporate by reference all paragraphs as though fully set forth herein.

399.   Plaintiffs bring this Count on behalf of the Kansas SubClass members against FCA.

- 125 -

400.   FCA is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"). Kan. Stat. Ann. § 50-624(1).

401.   Plaintiffs and Kansas SubClass members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

402.   The sale or lease of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

403.   The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann.§ 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have," and "(D) property or services are of a particular standard, quality, grade, style, or model, if they are of another which differs materiality from the representation"; "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; and "(3) the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

404.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the EGR cooler was defective, such that normal use of the Class Vehicles would cause coolant to leak and disperse throughout the vehicle's engine, leading to catastrophic engine failure and a fire. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

405.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Kansas SubClass members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles causes coolant to leak and disperse into the engine, leading to catastrophic engine failure and a vehicle fire.

406.   Plaintiffs and Kansas SubClass members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Kansas SubClass members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicle's EGR cooler is an internal part in the

Class Vehicles and Plaintiffs were not aware of the defective nature of the EGR cooler prior to purchase or lease.

407.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

408.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

409.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Kansas SubClass members.

410.    Defendant knew or should have known that its conduct violated the Kansas law regarding unfair or deceptive acts in trade or commerce.

411.    Defendant owed Plaintiffs and Kansas SubClass members a duty to disclose the truth about the EGR cooler defect because Defendant:

> a.   Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of EGR coolers to crack, including warranty claims relating to cracked EGR coolers;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Kansas SubClass members; and/or
>
> c.   Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Kansas SubClass members that contradicted these representations.

412.   Due to its specific and superior knowledge that the EGR coolers in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and Kansas SubClass members' reliance on these material representations, FCA had a duty to disclose to Plaintiffs and Kansas SubClass members that the EGR coolers were defective, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the EGR cooler will cause damage to Class Vehicle engines and engine systems and could pose a safety hazard due to fire, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Kansas SubClass members, FCA had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Kansas SubClass members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. FCA represented to Plaintiffs and Kansas SubClass members that they were purchasing or leasing vehicles that were free from defect, when in fact a cracked EGR cooler can create a ticking time bomb and leak coolant into a running engine, and it is only a matter of time before catastrophic failure occurs. Defendant also later represented that a fix was available for the EGR cooler defect.

- 129 -

413.   Defendant's conduct proximately caused injuries to Plaintiffs and the Kansas SubClass members.

414.   Plaintiffs and the Kansas SubClass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Kansas SubClass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

415.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

416.   Pursuant to Kan. Stat. Ann. §50-634, Plaintiffs and Kansas SubClass members seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Plaintiffs and each Kansas Subclass member. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

417.   Plaintiffs and Kansas SubClass members also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Kansas CPA.

## COUNT II

## BREACH OF EXPRESS WARRANTY

418.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

419.   Defendant was a merchant with respect to motor vehicles.

420.   In selling its vehicles, FCA expressly warranted in advertisements that its vehicles were free from defect, reliable and durable.

421.   These affirmations and promises were part of the basis of the bargain between the parties.

422.   Defendant breached these warranties arising from its advertisements, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective EGR cooler that can crack and cause an engine fire, leading to injury and property damage. The Class Vehicles share a common design defect in that the EGR cooler fails to operate as represented by FCA.

423.   As a direct and proximate cause of FCA's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

010939-11/1336705 V1

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (KAN. STAT. ANN. § 84-2-314)

424.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

425.   Plaintiffs bring this Count on behalf of the Kansas SubClass members against FCA.

426.   FCA was a merchant with respect to motor vehicles within the meaning of the Kan. Stat. Ann. § 84-2-314.

427.   Under Kan. Stat. Ann. § 84-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and Kansas SubClass members purchased or leased their Class Vehicles from FCA.

428.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the EGR coolers are defective, as they can crack, leading coolant to leak into a running engine, which can cause a fire (a condition that FCA knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

429.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Kansas SubClass members have been damaged in an amount to be proven at trial.

## COUNT IV

## FRAUDULENT CONCEALMENT
## (BASED ON KANSAS LAW)

430.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

431.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Kansas Subclass.

432.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide, based upon the common law in each state.

433.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

434.   FCA intentionally concealed that the Class Vehicles are defective.

435.   As alleged above, FCA further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and would perform and operate in

010939-11/1336705 V1

a safe manner. FCA further affirmatively misrepresented to Plaintiffs that a recall fix was readily available for the Class Vehicles when it was not.

436.   Defendant knew about the defect in the Class Vehicles when these representations were made.

437.   The Class Vehicles purchased by Plaintiffs and the other Class members contained defective EGR coolers.

438.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Defendant's material representations.

439.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the EGR cooler defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect as well as the subsequent recall. This made Defendant's other disclosures about the Class Vehicles deceptive.

440.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and the other Class members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class members.

441.   Plaintiffs and the other Class members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's

representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class members by concealing the true facts about the presence of a defect in the Class Vehicles and concealing true facts about the subsequent recall of the Class Vehicles.

442.   Defendant's false representations and omissions were material to consumers because they concerned the safety of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

443.   Defendant had a duty to disclose the EGR cooler defect and violations with respect to the Class Vehicles, as well as the lack of a remedy, because they concerned the safety of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

444.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class Vehicles, without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

445.   Defendant's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the EGR cooler defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class members.

446.   Defendant has still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defect and recall in the Class Vehicles.

447.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for the Class Vehicles with the EGR cooler defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

448.   Because of the concealment and/or suppression of facts, Plaintiffs and Class members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of the Class Vehicles. Had Plaintiffs and Class members been aware of the

EGR cooler defect, and Defendant's disregard for the truth, Plaintiffs and Class members would have paid less for their Class Vehicles or would not have purchased them at all.

449. The value of Plaintiffs' and Class members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the EGR cooler defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

450. Accordingly, Defendant is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

451. Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## BREACH OF CONTRACT
### (BASED ON KANSAS LAW)

452. Plaintiffs incorporate by reference all allegations as though fully set forth herein.

- 137 -

453.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class and the Kansas Subclass.

454.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

455.   FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's concealment and suppression of material facts concerning the durability, performance and quality of the Class Vehicles, and FCA's affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles, caused Plaintiffs and the other Class members to make their purchases or leases of their Trucks.

456.   Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective EGR cooler. Accordingly, Plaintiffs and the other Class members overpaid for their Trucks and did not receive the benefit of the bargain.

457.   Each and every sale or lease of a Truck constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability and

reliability of the Class Vehicles, as well as the presence of a defect in the Class

Vehicles, and by affirmatively making misleading statements concerning the

durability and reliability of the Class Vehicles, as well as the fact that a remedy

was available for the EGR cooler defect.

458.   As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Class have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the

Nationwide Class and California Subclass, Hawaii Subclass, Idaho Subclass, and

Kansas Subclass, respectfully request that the Court enter judgment in his/her/their

favor and against FCA as follows:

A.     Certification of the proposed Nationwide Class and California

Subclass, Hawaii Subclass, Idaho Subclass, and Kansas Subclass, including

appointment of Plaintiffs' counsel as Class Counsel;

B.     An order temporarily and permanently enjoining FCA from

continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in

this Complaint;

- 139 -

C.     Injunctive relief in the form of a vehicle recall, free replacement, or buy-back program;

D.     An order establishing FCA as a constructive trustee over profits wrongfully obtained, plus interest;

E.     Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.     An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

G.     Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

H.     A determination that Defendant is financially responsible for all Class notice and administration of class relief;

I.     Any and all applicable statutory and civil penalties;

J.     An award of costs and attorney's fees;

K.     Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

L.     Such other or further relief as the Court may deem appropriate, just, and equitable.

010939-11/1336705 V1

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated August 27, 2020

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Steve W. Berman*
Steve W. Berman
Anthea D. Grivas
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
antheag@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

010939-11/1336705 V1